FILED & JUDGMENT ENTERED
Christine F. Ramsey

September 25 2026

Clerk, U.S. Bankruptcy Court
Western District of North Carolina

Ashley Austin Edwards
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

| | |
|---|---|
| In re:<br><br>DBMP LLC,<br><br>Debtor. | Case No. 20-30080<br>Chapter 11 |
| DBMP LLC,<br><br>Plaintiff,<br><br>v.<br><br>THOSE PARTIES LISTED ON APPENDIX A TO COMPLAINT AND JOHN AND JANE DOES 1-1000,<br><br>Defendants. | Adv. Proc. No. 20-03004 |
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, and SANDER L. ESSERMAN, in his capacity as Legal Representative for Future Asbestos Claimants,<br><br>Plaintiffs,<br><br>v.<br><br>DBMP LLC and CERTAINTEED LLC,<br><br>Defendants. | Adv. Proc. No. 21-03023 |

| | |
|---|---|
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, and SANDER L. ESSERMAN, in his capacity as Legal Representative for Future Asbestos Claimants, each on behalf of the estate of DBMP LLC,<br><br>Plaintiffs,<br>v.<br><br>CERTAINTEED LLC, CERTAINTEED HOLDING CORPORATION, and SAINT-GOBAIN CORPORATION,<br><br>Defendants. | Adv. Proc. No. 22-03000 |
| OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS, on behalf of the estate of DBMP LLC,<br><br>Plaintiff,<br><br>v.<br><br>COMPAGNIE DE SAINT-GOBAIN S.A., SAINT-GOBAIN CORPORATION, SAINT-GOBAIN DELAWARE CORPORATION, CERTAINTEED LLC, CERTAINTEED HOLDING CORPORATION, JOSEPH BONDI, SEAN KNAPP, LAWRENCE RAYBURN, MICHAEL STARCZEWSKI, VINCENT DINENNA, ROBERT PANARO, DONALD MELROY, PIERRE-ANDRÉ DE CHALENDAR, BENOIT BAZIN, ANTOINE VIGNIAL, HUBERT REICHARDT, DANIEL BIARNEIX, SREEDHAR NATARAJAN, GUILLAUME TEXIER, THOMAS KINISKY, CAROL GRAY, JOHN SWEENEY, ERIC PLACIDET, MARK RAYFIELD, and KEITH CAMPBELL,<br><br>Defendants. | Adv. Proc. No. 22-03001 |

**ORDER DENYING PLAINTIFFS' MOTION TO COMPEL WITHOUT PREJUDICE AND PARTIALLY GRANTING MOTION OF NON-PARTY COMPAGNIE DE SAINT-GOBAIN S.A. FOR A PROTECTIVE ORDER**

**THIS MATTER** is before the Court upon the *Motion of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative to Compel Production of Compagnie de Saint-Gobain S.A.'s Documents or Modify the Preliminary Injunction*, filed on May 14, 2026 (the "Motion to Compel"),[1] and the *Motion of Non-Party Compagnie de Saint-Gobain S.A. for a Protective Order and Memorandum in Support*, filed on June 15, 2026 (the "Motion for a Protective Order";[2] together with the Motion to Compel, the "Motions"). The Motion to Compel arrives nearly two years after the Court's *Order Denying Motion to Compel*, entered on June 25, 2024 (the "Denial Order").[3] On June 15, 2026, the Debtor filed an *Objection to Motion of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative to Compel Production of Compagnie de Saint-Gobain S.A.'s Documents or Modify the Preliminary Injunction* (the "Debtor's Objection").[4] The *Objection of CertainTeed LLC, CertainTeed Holding Corporation and Saint Gobain Corporation to Plaintiffs' Motion to Compel Production of Compagnie de Saint-Gobain S.A.'s Documents or Modify the Preliminary Injunction* was also filed on June 15, 2026 (the "Non-Debtor U.S. Defendants' Objection").[5] CertainTeed LLC, CertainTeed Holding Corporation, Saint-Gobain Corporation, and Saint-Gobain Delaware Corporation (together, the "Non-Debtor U.S. Defendants"), along with the

---

[1] [Adv. Proc. No. 20-03004, Doc. No. 375; Adv. Proc. No. 21-03023, Doc. No. 438; Adv. Proc. No. 22-03000, Doc. No. 378; Adv. Proc. No. 22-03001, Doc. No. 346].
[2] [Adv. Proc. No. 21-03023, Doc. No. 474; Adv. Proc. No. 22-03000, Doc. No. 414].
[3] [Adv. Proc. No. 21-03023, Doc. No. 329; Adv. Proc. No. 22-03000, Doc. No. 269; Adv. Proc. No. 22-03001, Doc. No. 236].
[4] [Adv. Proc. No. 20-03004, Doc. No. 386; Adv. Proc. No. 21-03023, Doc. No. 473].
[5] [Adv. Proc. No. 21-03023, Doc. No. 470; Adv. Proc. No. 22-03000, Doc. No. 408; Adv. Proc. No. 22-03001, Doc. No. 373].

Debtor, are the direct or indirect subsidiaries of CSG, a French company. On June 26, 2026, Compagnie de Saint-Gobain S.A. ("CSG")[6] filed a *Memorandum of Law in Opposition to Plaintiffs' Motion to Compel* (the "CSG's Objection").[7]

On July 10, 2026, the Claimants filed *The Official Committee of Asbestos Personal Injury Claimants' and the Future Claimants' Representative's (I) Reply in Support of Their Motion to Compel Production of Compagnie de Saint-Gobain S.A.'s Documents or Modify the Preliminary Injunction and (II) Response in Opposition to Compagnie de Saint-Gobain S.A.'s Motion for a Protective Order* (the "Claimants' Reply and Response").[8] On July 23, 2026, CSG responded to the Claimants' Reply and Response by filing a *Reply Memorandum in Further Support of Non-Party Compagnie de Saint-Gobain S.A.'s Motion for a Protective Order* (the "CSG's Reply").[9]

On July 28, 2026, the Court held a hearing on the Motion to Compel and the Motion for a Protective Order (the "Hearing"). At the Hearing, Jeffrey Ellman, James Jones, and Garland Cassada appeared on behalf of the Debtor. Christopher Kiplok, Eric Blumenfeld, Erin Diers, and William Beausoleil appeared on behalf of CSG. Jack Miller, Gabrielle Gould, and Stacy Dasaro appeared on behalf of the Non-Debtor U.S. Defendants. Carrie Hardman, Cristina Calvar, Nathaniel Miller, Andrew DePeau, and Robert Cox appeared on behalf of the Official Committee of Asbestos Personal Injury Claimants (the "ACC"); Sean Greecher, Josh Richards, and William

[6] As of the date of entry of this Order, CSG is not listed as a named party in any of the four adversary proceedings in this Order [Adv. Proc. No. 20-03004; Adv. Proc. No. 21-03023; Adv. Proc. No. 22-03000; Adv. Proc. No. 22-03001].
[7] [Adv. Proc. No. 21-03023, Doc. No. 471; Adv. Proc. No. 22-03000, Doc. No. 409].
[8] [Adv. Proc. No. 20-03004, Doc. No. 391; Adv. Proc. No. 21-03023, Doc. No. 508; Adv. Proc. No. 22-03000, Doc. No. 450; Adv. Proc. No. 22-03001, Doc. No. 396].
[9] [Adv. Proc. No. 21-03023, Doc. No. 517; Adv. Proc. No. 22-03000, Doc. No. 464].

Zwicharowski appeared on behalf of the Future Claimants Representative (the "FCR" and together with the ACC, the "Claimants").

In the Motion to Compel, the Claimants request that this Court "enter an order (i) finding that CSG is subject to this Court's jurisdiction and compelling CSG to produce documents in response to the [CSG] Subpoenas or, in the alternative, modifying the Preliminary Injunction to remove CSG as a Protected Party, and, to the extent necessary, (ii) compelling the U.S. Defendants to produce CSG documents." Mot. to Compel at 29. In CSG's Objection to the Claimant's Motion to Compel, CSG asks the Court to "enforce CSG's uncontested objections to the scope of the [CSG] Subpoenas" and "quash requests 6 and 13" because of "multiple undue burdens." CSG's Objection ¶¶ 60, 81. In CSG's Motion for a Protective Order, CSG requests that this Court "appoint a commissioner under the Hague Evidence Convention." Mot. for a Protective Order ¶ 99. The Claimants objected to CSG's request for the appointment of a commissioner under the Hague Evidence Convention by arguing that "the Federal Rules apply to discovery from CSG." Claimants' Reply and Response ¶ 86. For the reasons below, Court denies the Claimants' Motion to Compel without prejudice and partially grants CSG's Motion for a Protective Order.

## I. BACKGROUND

The Motions come before the Court in the midst of a years-long discovery process, whereby the Claimants have sought to discern the implications and intentions behind the Restructuring[10] that culminated in the Debtor filing a Chapter 11 bankruptcy petition in the United States Bankruptcy Court in the Western District of North Carolina on January 23, 2020 (the "Petition Date"). On the Petition Date, the Debtor filed a *Motion of the Debtor for an Order (I) Preliminarily*

[10] The term "Restructuring" is heretofore defined as the restructuring that occurred on or about October 23, 2019, through which CertainTeed LLC, CertainTeed Holding Corporation, and DBMP LLC, among others, were created.

*Enjoining Certain Actions Against Non-Debtors Or, (II) in the Alternative, Declaring that the Automatic Stay Applies to Such Actions and (III) Granting a Temporary Restraining Order Pending a Final Hearing on the Merits* (the "Preliminary Injunction Motion")[11] to request the protection of the automatic stay and injunctive relief for eighty-seven (87) entities (the "Protected Parties"), one of which was CSG. *See* Preliminary Injunction Motion, App. B. The Court held a three-day hearing on the Preliminary Injunction Motion from March 1 through March 3, 2021, which included opening statements, arguments, over fifty exhibits, and "live testimony from two expert witnesses on certain financial and restructuring matters."[12] On August 11, 2021, the Court granted the Preliminary Injunction Motion, through the Court's *Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Denying Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay, and Alternatively (III) Preliminarily Enjoining Such Actions* and the Court's *Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Denying Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay, and Alternatively (III) Preliminarily Enjoining Such Actions*[13] (together, the "Preliminary Injunction"). The Preliminary Injunction "prohibited and enjoined" the Claimants "from commencing or continuing to prosecute any DBMP Asbestos Claim against any of the Protected Parties, on any theory of liability, whether direct, derivative, joint and several, successor liability, vicarious liability, fraudulent or voidable transfer or conveyance, alter ego or otherwise." Preliminary Injunction ¶ 2. The Preliminary Injunction protected CSG by preventing "continued

[11] [Adv. Proc. No. 20-03004, Doc. No. 2].
[12] *Findings of Fact and Conclusions of Law Regarding Order: (I) Declaring That the Automatic Stay Applies to Certain Actions Against Non-Debtors, (II) Denying Motion of the Official Committee of Asbestos Personal Injury Claimants to Lift the Stay, and Alternatively (III) Preliminarily Enjoining Such Actions* ¶ 18 [Case No. 20-30080, Doc. No. 972; Adv. Proc. No. 20-03004, Doc. No. 343].
[13] [Case No. 20-30080, Doc. No. 973; Adv. Proc. No. 20-03004, Doc. No. 344].

litigation of DBMP Asbestos Claims against Protected Parties in the tort system . . . [that] would undoubtedly interfere with, and almost surely end, the Debtor's reorganization." Preliminary Injunction ¶ 280.

On May 23, 2022, the Court entered a consensual *Case Management Order*[14] that declared, "[a]ll discovery conducted after the date of this Order as part of any of the Adversary Proceedings . . . shall be deemed to have occurred in all Adversary Proceedings, including, without limitation, the Fiduciary Duty Proceeding[15] that is otherwise being held in abeyance." Case Management Order § C(1)(i). On June 7, 2022, the parties agreed to and the Court entered a *Stipulation and Order Regarding Stay* (the "Stipulation"),[16] which stayed the Fiduciary Duty Proceeding "in its entirety pending entry of Final orders resolving the Fraudulent Transfer Proceeding[17] and the Substantive Consolidation Proceeding."[18] Stipulation ¶ 1. The Stipulation further instructed that "all discovery conducted as part of any of the Adversary Proceedings shall be deemed to have

[14] [Case No. 20-30080, Doc. No. 1439; Adv. Proc. No. 21-03023, Doc. No. 94; Adv. Proc. No. 22-03000, Doc. No. 48; Adv. Proc. No. 22-03001, Doc. No. 37] (the "Case Management Order").

[15] *Official Committee of Asbestos Personal Injury Claimants v. Compagnie de Saint-Gobain S.A.*, Adv. Proc. No. 22-03001 (Bankr. W.D.N.C. Jan. 23, 2022) (the "Fiduciary Duty Proceeding").

[16] [Adv. Proc. No. 22-03001, Doc. No. 49].

[17] The Claimants' *Complaint*, filed on January 21, 2022, alleged actual and constructive fraudulent transfer (the adversary proceeding hereinafter labeled the "Fraudulent Transfer Proceeding"). Compl. ¶¶ 114–147, *Official Committee of Asbestos Personal Injury Claimants v. CertainTeed LLC*, Adv. Proc. No. 22-03000 (Bankr. W.D.N.C. Jan. 21, 2022). Specifically, the Claimants assert four causes of action against the Non-Debtor U.S. Defendants: (1) "Actual Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550[;]" (2) "Actual Fraudulent Transfer Pursuant to 11 U.S.C. § 544(b) and the Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act[;]" (3) "Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550[;]" and (4) "Constructive Fraudulent Transfer Pursuant to 11 U.S.C. §§ 544(b) and the Uniform Fraudulent Transfer Act and/or Uniform Voidable Transactions Act." Am. Compl. ¶¶ 118-152 [Doc. No. 14], Fraudulent Transfer Proceeding (Bankr. W.D.N.C. Feb. 10, 2022).

[18] The Claimants' *Complaint for Entry of an Order Substantively Consolidating the Estate of DBMP LLC With CertainTeed LLC or, in the Alternative, Reallocating the Asbestos Liabilities of the Debtor o CertainTeed LLC*, filed on August 23, 2021 [Adv. Proc. No. 21-03023; Doc. No. 1], seeks to "substantively consolidate[e] the bankruptcy estate of DBMP with nondebtor CertainTeed, *nunc pro tunc* as of the Petition Date" (the adversary proceeding hereinafter labeled the "Substantive Consolidation Proceeding"). Compl. at 22, *Official Committee of Asbestos Personal Injury Claimants v. DBMP LLC*, Adv. Proc. No. 21-03023 (Bankr. W.D.N.C. Aug. 23, 2021).

occurred in all Adversary Proceedings, including, without limitation, the Fiduciary Duty Proceeding that is otherwise subject to the Stay." Stipulation ¶ 3.

On or about June 12, 2023, the Claimants served discovery requests on the Debtor and the Non-Debtor U.S. Defendants as part of the Fraudulent Transfer Proceeding and the Substantive Consolidation Proceeding (the "2023 Discovery Requests"). *See* Mot. to Compel ¶ 12; *see also* CSG's Objection ¶ 22. The 2023 Discovery Requests sought "documents, communications, and information concerning CSG's intent and involvement in the" Restructuring. Mot. to Compel ¶ 12. On January 23, 2024, Claimants received a letter from counsel for the Non-Debtor U.S. Defendants stating that the Non-Debtor U.S. Defendants "do not have possession, custody, or control over [CSG's] documents." Mot. to Compel at 6 n.16 (quoting Letter from Gabrielle L. Gould, counsel for Non-Debtor U.S. Defendants, to Carrie V. Hardman, counsel for Claimants (Jan. 23, 2024), at 3).[19] During a hearing on March 7, 2024, the Court authorized the Claimants to take limited depositions of the Non-Debtor U.S. Defendants under Federal Rule of Civil Procedure 30(b)(6) to

[19] On June 6, 2025, the Claimants followed up with Non-Debtor U.S. Defendants to ask whether they would "produce (i) responsive documents created or maintained by CSG, such as those related to the Core Issues; (ii) documents or correspondence between CSG executives and other persons external to the CSG enterprise, such as auditors, related to the Core Issues; and/or (iii) documents reflecting correspondence between CSG and the U.S. Defendants." Mot. to Compel ¶ 21. The Non-Debtor U.S. Defendants responded by asserting that they were only willing to produce responsive documents involving CSG that the Non-Debtor U.S Defendants explicitly received. *Id.*; *see also* Non-Debtor U.S. Defendants' Objection ¶ 2 ("The Non-Debtor Defendants further made clear that, notwithstanding their objections, to the extent non-privileged responsive documents of CSG are in the files of the Non-Debtor Defendants, including those located through searches of agreed-upon U.S. document custodians and therefore within the Non-Debtor Defendants' [possession, custody, or control], such documents would be produced."); CSG's Objection ¶ 31; Hr'g Tr. 92:19-24 (July 28, 2026) (articulating the belief of counsel for the Non-Debtor U.S. Defendants that the Claimants are "going to get documents that are between either the debtor and Non-Debtor Affiliates or between those entities and CSG, to the extent that they are picked up by the agreed-upon search terms and they are responsive and not privileged").

clarify the extent to which the Non-Debtor U.S. Defendants maintained possession, custody, or control over CSG's documents and communications.[20]

Following the Court's authorization, the Claimants deposed Thomas Pier, Chief Technology Officer of Saint-Gobain North America, and Sheri Brutsch, Associate General Counsel at Saint-Gobain Corporation, on April 25, 2024. *See* Non-Debtor U.S. Defendants' Objection at 3 n.5; *see also* Mot. to Compel Ex. B. Shortly thereafter, on May 6, 2024, the Claimants issued two subpoenas to CSG (the "CSG Subpoenas"), one in the Fraudulent Transfer Proceeding and the other in the Substantive Consolidation Proceeding. *See* Mot. to Compel ¶ 14, Ex. F; *see also* CSG's Objection ¶ 23. The CSG Subpoenas include twenty-six requests that CSG asserts are "substantive[ly] . . . identical" to the requests that the Claimants sent to the Debtor and Non-Debtor U.S. Defendants. CSG's Objection ¶ 23, Ex. A; *see also* Mot. to Compel Ex. F.

On May 22, 2024, CSG sent a letter to Service de l'Information Stratégique et de la Sécurité Economiques (SISSE), a French government agency within the Ministry for the Economy, Finance and Industrial and Digital Sovereignty, asking for guidance on how to "comply with French Law" and "seek[ing] clearance to respond" to the CSG Subpoenas. CSG's Objection ¶ 24, 27; *see also* Mot. to Compel ¶ 19. CSG sent its letter to SISSE after the Claimants had already filed their initial *Motion of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative to Compel the U.S. Defendants to Produce Documents* on May 6, 2024.[21] On July 4, 2024, SISSE responded to CSG's letter (the "SISSE Letter"),[22] informing CSG that it would be required to produce evidence under the Hague Convention on the Taking of

---

[20] *See* Hr'g Tr. at 75:11–12, Fraudulent Transfer Proceeding [Doc. No. 196] (Bankr. W.D.N.C. Mar. 7, 2024) (ordering the Claimants and Non-Debtor U.S. Defendants to "[d]o the depositions in short order.").

[21] [Adv. Proc. No. 21-03023, Doc. No. 302; Adv. Proc. No. 22-03000, Doc. No. 243; Adv. Proc. No. 22-03001, Doc. No. 211].

[22] See exhibit C of the Declaration of William J. Beausoleil, filed on June 15, 2026 [Adv. Proc. No. 21-03023; Doc. Nos. 472 & 476; Adv. Proc. No. 22-03000, Doc. Nos. 410 & 416] (the "Beausoleil Declaration").

Evidence Abroad in Civil or Commercial Matters, *opened for signature* Mar. 18, 1970, 23 U.S.T. 2555, 847 U.N.T.S. 241 (the "Hague Evidence Convention"). *See* CSG's Objection ¶ 27; Ex. C, at 4 (exhibiting the Letter from Mathieu Kahn, Adjoint Au Chef, SISSE, to Antoine Vignial, Secrétaire Général, CSG (July 4, 2024)).

On July 5, 2024, exactly one day after CSG received a reply from SISSE, CSG responded to the CSG Subpoenas (the "CSG's Response to the CSG Subpoenas"). *See* Mot. to Compel ¶ 18; CSG's Objection ¶ 28; Mot. for a Protective Order ¶ 31. In CSG's Response to the CSG Subpoenas, CSG asserted that it "is not a party to this Action,"[23] and thus, "CSG will not produce responsive documents and communications, unless, and only if, (a) CSG shared those documents with any of the Defendants, (b) any of those communications included any of the Defendants, or (c) any of the documents or communications expressly reflect a communication with Defendants." Mot. to Compel ¶ 18. CSG further explained that "[d]ocuments and communications that were entirely internal to CSG and that do not fall within any of these categories are not relevant to any of the claims raised in this Action and are therefore not discoverable." *Id.* With respect to "24 of the 26 substantive requests for production,"[24] CSG has only been "willing to produce responsive documents, subject to the objections raised, so long as the parties proceeded under the Hague Evidence Convention." CSG's Objection ¶ 29. The general objections raised by CSG to the CSG Subpoenas included overbreadth, redundancy, unduly burdensome, and relevance. *Id.* ¶ 29, 45–75 (citing Beausoleil Decl. Exs. E & F). CSG specifically objected to the sixth and thirteenth requests

[23] *See* Beausoleil Decl. Ex. F, at 3; Response Nos. 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 & 25.

[24] CSG specifically objected to requests six and thirteen in the CSG Subpoenas. *See* CSG's Objection ¶ 76–81.

for production on the grounds of relevance, attorney-client privilege, and attorney work-product privilege. *Id.* ¶ 30.

On May 29, 2025, the Claimants requested to meet-and-confer with CSG regarding CSG's Response to the CSG Subpoenas.[25] CSG's Objection ¶ 31 (citing Beausoleil Decl. Ex. K, at 4-5); *see* Mot. to Compel ¶ 20. On July 1, 2025, the Claimants then sent fourteen questions in a follow-up letter to CSG, to which CSG answered on July 17, 2025. CSG's Objection ¶ 31 (referencing Beausoleil Decl. Exs. K at 1, L & M). During the meet-and-confer on July 21, 2025, CSG reiterated its position that it would only produce responsive documents and communications to the CSG Subpoenas under the Hague Evidence Convention procedures. Mot. to Compel ¶ 22; CSG's Objection ¶ 32. In the months that followed, the Claimants and CSG engaged in further discussions regarding "electronically-stored information, custodians, and search terms." CSG's Objection ¶ 33. Negotiations continued until January 22, 2026,[26] and, as of the date of the Hearing, CSG and the Claimants appear to have substantially narrowed the dispute with regards to timeframe,[27] custodians,[28] and sources of electronically stored information,[29] but the specific search terms

---

[25] The meet-and-confer on May 29, 2025, appears to follow a prior request for such a meeting sent via email by Carrie Hardman, counsel for the ACC, on March 5, 2025. *See* Beausoleil Decl. Ex. K, at 6–7. At roughly the same time period in 2025, Judge Bridges issued the *Discovery Referee Final Report and Recommendations Concerning Privilege Log Documents, Attorney-Client Privilege, Alleged Waiver and Crime/Fraud Exception to the Privilege*, filed on April 24, 2025 [Case No. 20-30080, Doc. No. 3139; Adv. Proc. 21-03023, Doc. No. 370; Adv. Proc. No. 22-03000, Doc. No. 306; Adv. Proc. No. 22-03001, Doc. No. 276], and *Appendix B, C, D, E to Discovery Referee Report and Recommendation*, filed on June 20, 2025 [Case No. 20-30080, Doc. No. 3187; Adv. Proc. 21-03023, Doc. No. 380; Adv. Proc. No. 22-03000, Doc. No. 318; Adv. Proc. No. 22-03001, Doc. No. 288] (together, the "Final Referee Report").

[26] "However, CSG's January 22, 2026 message was the last correspondence." CSG's Objection ¶ 35; Beausoleil Decl. Ex. Q, at 1-3).

[27] *See* CSG Subpoenas ¶ 2 ("[T]he relevant time period covered by these Requests is from January 1, 2017 to and through the Petition Date."); Beausoleil Decl. Ex. Q, at 4 (listing the "period of January 1, 2017 to June 30, 2020").

[28] *See* Beausoleil Decl. Ex. Q, at 4 (listing Antoine Vignial, Sreedhar Natarajan, Hubert Reichardt, Pierre-André De Chalendar, Benoit Bazin, and Daniel Biarneix, Gaby Kelhetter-Amette, Guillaume Texier, Laurence Pernot, and Jean-François Phelizon as the custodians that the Claimants were interested in).

[29] *See* Beausoleil Decl. Ex. Q, at 4 (describing email inboxes).

remained in dispute as of the filing date of the Motion to Compel.[30] *See* Hr'g Tr. 129:15-130:6, July 28, 2026.[31]

## II. DISCUSSION

1. The Claimants served the 2023 Discovery Requests and the CSG Subpoenas on the Debtor, the Non-Debtor U.S. Defendants, and CSG respectively, in order to gather discovery information, which can be categorized into three buckets. The first bucket of the Claimants' requests consists of documents and communications between, and among, the Debtor and Non-Debtor U.S. Defendants (the "U.S. Internal Evidence"). The Claimants' Motion to Compel does not implicate the U.S. Internal Evidence because the Claimants, the Debtor, and the Non-Debtor U.S. Defendants "are finalizing the list of English search terms, and intend to then negotiate the French search terms," for the "internal and external documents and communications of each entity." Claimants' Reply and Resp. ¶ 4–5.[32] The Claimants "anticipate reaching [an] agreement" with respect to the U.S. Internal Evidence.[33] *Id.* ¶ 5.

2. The second bucket of discovery information sought by the Claimants consists of the documents and communications transmitted between the U.S. entities (the Debtor and the Non-Debtor U.S. Defendants) and CSG (the "U.S.-CSG Evidence").[34] It appears that some degree of

---

[30] *See* Beausoleil Decl. Exs. N at 1, Q ("Per our conference on July 21, we attach hit reports showing the number of documents that CSG would review based on the current sets of search terms that the Committee recently suggested to the debtor and the U.S. non-debtor affiliates.").

[31] [Case No. 20-30080, Doc. No. 3565; Adv. Proc. 20-03004, Doc. No. 400; Adv. Proc. 21-03023, Doc. No. 527; Adv. Proc. No. 22-03000, Doc. No. 476; Adv. Proc. No. 22-03001, Doc. No. 411].

[32] *See also* Hr'g Tr. 20:7-13, July 28, 2026 (confirming, through counsel for the Claimants, that the Claimants, the Debtor, and the Non-Debtor U.S. Defendants "have gone through search terms and reached agreement on the English terms" and have "managed to reach agreement amongst ourselves" regarding the French search terms).

[33] "Thus, any disputes about search terms, or related discovery issues," involving "documents and communications by and among" the Debtor and the Non-Debtor U.S. Defendants "are not the subject of [the Motion to Compel]." Claimants' Reply and Response ¶ 4-5.

[34] The U.S.-CSG Evidence includes any communications or documents that the Debtor or Non-Debtor U.S. Defendants received as recipient, were carbon copied on, or that CSG expressly shared with them on the Microsoft Teams or other digital platform. *See* Claimants' Reply and Response ¶ 23.

progress towards production of the U.S.-CSG Evidence has been made given the Claimants' "expect[ation] that the [Debtor and Non-Debtor U.S. Defendants] will produce copies of any such communications with CSG in their possession."[35] *Id.* ¶ 6. While the Debtor and the Non-Debtor U.S. Defendants "have not completed production of their own files, which contain certain CSG documents dispatched to or received from CSG," they continue to "negotiate search terms" with the Claimants. Debtor's Objection at 2; *see also* Hr'g Tr. 20:7-13, July 28, 2026. Furthermore, the Non-Debtor U.S. Defendants have "made clear that, notwithstanding their objections, to the extent non-privileged responsive documents of CSG are in the files of the Non-Debtor Defendants, including those located through searches of agreed-upon U.S. document custodians and therefore within the Non-Debtor Defendants' PCC, such documents would be produced." Non-Debtor U.S. Defendants' Objection ¶ 2. While the Court is encouraged by the progress that has been made towards the production of the U.S. Internal Evidence and the U.S.-CSG Evidence,[36] the Court will set a status hearing on February 4, 2027, to ensure the discovery process proceeds swiftly.

3. The remaining dispute between the Claimants and CSG relates to the third bucket of discovery information requested by the Claimants: "documents and communications by and among CSG employees, and between CSG employees and unrelated third parties, all regarding the purpose, planning, implementation, and execution of the Restructuring and resulting DBMP

---

[35] CSG believes that the Claimants "can obtain CSG's alleged communications with the direct Defendants from the direct Defendants themselves." Mot. for a Protective Order. ¶ 59. "Of the 26 requests for production in the Subpoenas, 22 are identical, or substantially similar, to the requests that Plaintiffs have already served on the direct Defendants in the Fraudulent Conveyance Proceeding. . . . The other four requests are identical, or substantially similar, to the requests that Plaintiffs have already served on the direct Defendants in the Substantive Consolidation Proceeding." *Id.* ¶ 73. Irrespective of the Non-Debtor U.S. Defendants' response to the Claimants' subpoenas, "CSG is still willing to produce information on any purported approvals or directives that it sent to its U.S. affiliates related to the corporate restructuring or DBMP's bankruptcy filing." CSG Objection ¶ 51.

[36] *See* Hr'g Tr. 90:5-7, July 28, 2026 (affirming the belief of counsel for the Non-Debtor U.S. Defendants that production is "all underway" because "the parties have agreed upon English search terms" and "[t]he next step is for the parties to agree upon a set of corresponding French search terms").

bankruptcy" (the "CSG Exclusive Evidence").[37] *Id.* ¶ 7. CSG's Motion for a Protective Order focuses on the CSG Exclusive Evidence. Mot. for a Protective Order ¶ 5.

**A. Personal Jurisdiction.**

4. In deciding either of the Motions, the Court must first assess whether it has personal jurisdiction over CSG. First, CSG has expressly waived personal jurisdiction for purposes of its Motion for a Protective Order. *See* Mot. for a Protective Order at 13 n.13 ("For the purpose of this motion, CSG assumes that the Court has personal jurisdiction over CSG to enforce the Subpoenas."); CSG's Reply ¶ 8 ("[T]his Court has discretion to direct the parties to proceed under the Hague Evidence Convention."). Second, the Court has personal jurisdiction over CSG for purposes of the Motion to Compel, contrary to CSG's attempts to preserve the issue in CSG's Objection[38] and "for all purposes."[39]

5. There are two kinds of personal jurisdiction that a "court may exercise[:] general or specific personal jurisdiction." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016). General personal jurisdiction exists when a foreign company's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). In *Daimler*, the Supreme Court of the United States found that

---

[37] "CSG declined to produce '[d]ocuments and communications that were entirely internal to CSG.'" CSG's Objection ¶ 51 (quoting Beausoleil Decl. Ex. E, at 10; Ex. F, at 10).

[38] CSG believes that the Court "need not decide personal jurisdiction now" because "jurisdiction is not an obstacle to CSG's producing responsive documents." CSG's Objection ¶ 39.

[39] CSG's Objection ¶ 38 ("The objection is intended to preserve CSG's challenge to personal jurisdiction for all purposes, including the assertion of personal jurisdiction over CSG and its officers named as Defendants in the Fiduciary Duty Proceeding, should the Court ever lift the stay order."); *see also* CSG's Response to the CSG Subpoenas (claiming, in response to all twenty-six requests, that the "subpoena is not enforceable on its face" because "Plaintiffs have not established . . . the Court's personal jurisdiction over CSG"); Stipulation ¶ 2 ("[E]ach Fiduciary Duty Defendant expressly preserves, all rights, claims and defenses, including, but not limited to, all defenses relating to jurisdiction.").

a U.S. federal district court in California did not have general personal jurisdiction over a German parent company even when a U.S. subsidiary sold a significant number of cars in the state because neither entity was "incorporated in California, nor d[id] either entity have its principal place of business there."[40] *Id.* General personal jurisdiction is not applicable here because CSG's "domicile" is France. *See* Mot. for a Protective Order ¶ 6 ("CSG is French company headquartered in Courbevoie, France."). Domicile is where "the corporation is fairly regarded as at home" *Goodyear Dunlop Tires Operations*, 564 U.S. at 924. CSG cannot be "regarded as at home" in North Carolina due the limited connection that CSG has directly with the state.[41] *Id.* CSG's affiliations with North Carolina are not "so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Daimler*, 571 U.S. at 139. Furthermore, the Claimants do not raise the issue of general personal jurisdiction in their Motion to Compel. *See* Mot. To Compel ¶ 25–31.

6. While the Court may not have general personal jurisdiction over CSG, the Court possesses and exercises specific personal jurisdiction over CSG. A court may "exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Goodyear Dunlop Tires Operations*, 564 U.S. at 923 (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940))). The "minimum contacts" test requires the

[40] The legal question of whether a court can exercise general personal jurisdiction over a foreign parent company due to the actions of its U.S. subsidiaries was not addressed in the Motion to Compel or of the corresponding objections. *See* Aaron D. Simowitz & Linda J. Silberman, *Nonparty Jurisdiction*, 55 VANDERBILT J. TRANSNATIONAL L. 433, 446 (2023) ("Courts have been confused as to how to handle cross-border discovery requests in the aftermath of *Daimler*. . . . The confusion resulting from this results-oriented approach will no doubt be felt in more complicated cases, such as those involving data or documents held abroad but generated by domestic conduct.").

[41] While CSG has multiple subsidiaries incorporated in and operating out of the United States, CSG itself does not sell products or have an office in the United States. *See* Mot. for a Protective Order ¶ 6.

Claimants to show that CSG "purposefully directed [its] activities at the residents of the forum" and that the Claimants' "cause[s] of action 'arise out of' those activities." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985)); *see also Boon Partners v. Advanced Fin. Concepts, Inc.*, 917 F. Supp. 392, 397 (E.D.N.C. 1996) ("Under the Fifth Amendment, due process permits a federal court to assert personal jurisdiction over a defendant who has minimum aggregate contacts with the United States.").[42] The final requirement of the minimum contacts test is an assessment of whether "personal jurisdiction is 'reasonable and fair.'" *Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1353 (Fed. Cir. 2017) (quoting *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1360 (Fed. Cir. 2001)). In terms of burden, the Claimants "need only make a prima facie showing of personal jurisdiction" in situations "[w]hen the court decides a pretrial motion to dismiss for lack of personal jurisdiction without receiving evidence." *Red Hat, Inc. v. Competitive Access Sys., Inc.*, 786 F. Supp. 3d 945, 953 (E.D.N.C. 2025).

7. In the context of a bankruptcy adversary proceeding, "nationwide contacts, not contacts with the forum state," are assessed in the minimum contacts test. *Hackman v. Wilson* (*In re Hackman*), 534 B.R. 867, 871 (Bankr. E.D. Va. 2015) (citing *Owens-Ill., Inc. v. Rapid Am. Corp.* (*In re Celotex Corp.*), 124 F.3d 619, 630 (4th Cir. 1997)). Therefore, a bankruptcy court "need only ask whether [a party] has minimum contacts with the United States." *In re Celotex Corp.*, 124 F.3d at 630.[43]

---

[42] Although not contested, it should be noted that "North Carolina's long-arm statute is construed to extend jurisdiction to the full extent permitted by the Due Process Clause." *Manley v. Air Canada*, 753 F. Supp. 2d 551, 556 (E.D.N.C. 2010) (citing *Young v. New Haven Advocate,* 315 F.3d 256, 261 (4th Cir. 2002); *Nichols v. G.D. Searle & Co.,* 991 F.2d 1195, 1199 (4th Cir.1993)).

[43] *See also In re Motors Liquidation Co.*, 565 B.R. 275, 285 (Bankr. S.D.N.Y. 2017) ("In a Bankruptcy proceeding, the sovereign is the United States, so the Court first 'determine[s] whether the defendant has the requisite minimum contacts with the United States at large.'" (quoting *Official Comm. of Unsecured Creditors of Arcapita Bank B.S.C. v. Bahrain Islamic Bank*, 549 B.R. 56, 63 (Bankr. S.D.N.Y. 2016)); *Fairfield Sentry Ltd. v. HSBC Securities Servs.*

8. Here, the Court exercises specific personal jurisdiction over CSG due to CSG's numerous contacts with the United States, notably CSG's frequent in-person meetings, conference calls, emails with the Non-Debtor U.S. Defendants, and the final "approval from Paris"[44] required to execute the Restructuring and the Debtor's bankruptcy filing. *See In re Hackman*, 534 B.R. at 871 (requiring only "nationwide contacts" to satisfy the minimum contacts test in a bankruptcy adversary proceeding). The ample factual record available to the Court in the Debtor's bankruptcy base case, the Fraudulent Transfer Proceeding, and the Substantive Consolidation Proceeding, demonstrates that CSG has "purposefully directed [its] activities" at the United States. *Consulting Eng'rs Corp.*, 561 F.3d at 277. CSG was heavily involved in the planning and execution of the Restructuring and the Debtor's bankruptcy filing.[45] The Restructuring required a high degree of coordination between CSG, CSG's U.S. subsidiaries (the Non-Debtor U.S. Defendants and their predecessors), and counsel that resulted in a myriad of emails, conference calls,[46] "letters[,] and phone calls initiated from out-of-state." *Jack Henry & Assocs., Inc. v. Plano Encryption Techs.*

---

*(Luxembourg) S.A.* (*In re Fairfield Sentry Ltd.*), 657 B.R. 1, 11 (Bankr. S.D.N.Y. 2024) ("In adversary proceedings, courts must determine whether the defendant has minimum contacts with the United States, rather than with the forum state." (quoting *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021)).

[44] Final Referee Report App. C, at No. 1623.

[45] *See* Final Referee Report App. B, at No. 135 (describing an email that "[s]hows early involvement of Paris officials in planning process"); *id.* App. B, at No. 109 (describing a message by CSG's General Counsel detailing the "level of involvement by Paris officers" and "showing the level of his input and involvement in the decision making process"); *id.* App C, at No. 1623 (describing an activity tracker for the Restructuring that detailed "how decision was made to file Bky and early intent (Nov 2018) to do so, including the need to get approval from Paris"); *id.*, App. E, at No. 3802 (highlighting an email from a CSG employee and consultant that shows "that the decision to file Bky was made before the divisional merger[,]" which "is contrary to assertions made by Debtor and its officers in deposition testimony"); *Order Partially Granting and Sustaining and Partially Denying Plaintiffs' Privilege Motion and Defendants' Objection* at 43 n.223 [Case No. 20-30080, Doc. No. 3390; Adv. Proc. 21-03023, Doc. No. 411; Adv. Proc. No. 22-03000, Doc. No. 348; Adv. Proc. No. 22-03001, Doc. No. 317] (March 16, 2026) (referencing indications in the Final Referee Report "that officials from CSG were actively involved in planning the divisional merger and the handling of asbestos liabilities, which ran counter to suggestions that the parent company was hands-off or not part of the reorganization planning").

[46] *See* Mot. to Compel ¶ 29.

*LLC*, 910 F.3d 1199, 1205 (Fed. Cir. 2018) (citing *Inamed Corp.*, 249 F.3d at 1362). CSG executives frequently traveled back-and-forth between France and the United States to plan and carry out the Restructuring.[47] Mot. to Compel ¶ 29, 36. Furthermore, CSG maintains a financial and accounting relationship with the Debtor and the Non-Debtor U.S. Defendants.[48] The considerable degree of coordination between CSG and its subsidiaries resulted in direct and enduring contact with the United States and included coordination for, and execution of, the Debtor's Funding Agreement.[49] The Claimants' causes of action in the Fraudulent Transfer

---

[47] *See Xilinx, Inc.*, 848 F.3d at 1354 ("Papst purposefully directed its activities to California when it sent multiple notice letters to Xilinx and traveled there to discuss Xilinx's alleged patent infringement and potential licensing arrangements.").

[48] *See* Mot. to Compel ¶ 29 ("CSG maintains close financial ties to the U.S. Defendants, including through its consolidated financial statements, which reflect billions of dollars in intercompany 'loans' from U.S. Defendants."); *Debtor's Reply in Support of Motion for Reconsideration and Amendment of Order Partially Granting and Sustaining and Partially Denying Plaintiffs' Privilege Motion and Defendants' Objection* ¶ 9, n.3 [Case No. 20-30080, Doc. No. 3446; Adv. Proc. No. 21-03023, Doc. No. 433; Adv. Proc. No.22-03000, Doc. No. 371; Adv. Proc. No. 22-03001, Doc. No. 341] (May 8, 2026); *Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment* at 13, n.44 [Adv. Proc. No. 22-03000, Doc. No. 376] (citing CSG's Statutory Auditor's Report on the Consolidated Financial Statements for the Year Ended Dec. 31, 2025, at 47). Additionally, as part of the Funding Agreement, CertainTeed LLC has continued to pay the Debtor's legal fees. *See Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Retained Professionals* [Case No. 20-30080, Doc. No. 150] (Feb. 13, 2020); Order Denying Plaintiffs' Motion for Partial Summary Judgment ¶ 8 [Case No. 20-30080, Doc. No. 504] (Sept. 17, 2026) ("As of February 18, 2021, DBMP had requested an aggregate of $64.5 million, principally for administrative costs of the bankruptcy case, and New CertainTeed had funded all such requests." (citing *In re DBMP LLC*, 2021 WL 3552350, at *17 (Bankr. W.D.N.C. Aug. 11, 2021))).

[49] *Declaration of Robert J. Panaro in Support of First Day Pleadings*, Annex 2, at 5–6 ("'Permitted Funding Use' means . . . the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case that are necessary or appropriate in connection therewith, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business.") [Case No. 20-30080, Doc. No. 24] (Jan. 23, 2020), *Stipulation Between the Debtor and CertainTeed LLC Regarding Second Amended Funding Agreement* [Case No. 20-30080, Doc. No. 1279] (Jan. 5, 2022) ("'Permitted Funding Use' means . . . the payment of any and all costs and expenses of the Payee incurred during the pendency of any Bankruptcy Case, including the costs of administering the Bankruptcy Case and any and all other costs and expenses of the Payee incurred in the normal course of its business.") (together, the "Funding Agreement"). The Funding Agreement is "valid, enforceable, and fully protective of claimants' payment interests." *Defendants' Objection to Referee Reports and Recommendations* at 20 [Case No. 20-30080, Doc. No. 3212; Adv. Proc. No. 21-03023, Doc. No. 383; Adv. Proc. No.22-03000, Doc. No. 321; Adv. Proc. No. 22-03001, Doc. No. 292] (July 25, 2026); *see also Stipulation Between the Debtor and CertainTeed LLC Regarding Second Amended Funding Agreement* ¶ 2 [Case No. 20-30080, Doc. No. 1279] (finding the Funding Agreement to be "a valid contract, enforceable in accordance with its terms").

Proceeding and Substantive Consolidation Proceeding "arise out of" CSG's extensive business dealings with its U.S. subsidiaries and third parties in the United States, both before and after the Petition Date.[50] Mot. to Compel ¶ 29.

9. Finally, the Court's exercise of "personal jurisdiction [over CSG] is 'reasonable and fair'" because CSG chose this forum and actively participated in the Fraudulent Transfer Proceeding and Substantive Consolidation Proceeding. *See Xilinx, Inc.*, 848 F.3d at 1353 (quoting *Inamed Corp*, 249 F.3d at 1360). CSG was put on notice when it received and responded to the CSG Subpoenas.[51] CSG subsequently filed the Motion for a Protective Order,[52] and its counsel[53] engaged in frequent meet-and-confers with the Claimants,[54] exchanged countless emails,[55] and

---

[50] *Consulting Eng'rs Corp.*, 561 F.3d at 277 (quoting *Burger King Corp.,* 471 U.S. at 472); *see also Trimble Inc. v. PerDiemCo LLC*, 997 F.3d 1147, 1155 (Fed. Cir. 2021) ("An entity that repeatedly sends communications into a forum state 'clearly has "fair warning that [its] activity may subject [it] to the jurisdiction of a foreign sovereign."'" (quoting *Quill Corp. v. North Dakota*, 504 U.S. 298, 308 (1992))).

[51] *See* CSG's Response to the CSG Subpoenas.

[52] The Claimants also argue that CSG has waived personal jurisdiction by actively participating in the matter. Mot. to Compel ¶ 25–27. While the case law is clear that personal jurisdiction "may be waived by a defendant's 'express or implied consent to the personal jurisdiction of the court,'" it is less clear if a third party that is not a defendant can waive personal jurisdiction. *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 131 (4th Cir. 2020) (quoting *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)). Waiver may occur if a party "actively participat[es] in a case." *Box Alarm Leather, LLC v. Manuel*, No. 3:23-CV-129, 2023 WL 9197952, at *2 (N.D.W. Va. Oct. 25, 2023). While "'there is no bright line rule' for 'what constitutes waiver by conduct,'" the "overarching inquiry is whether the defendant's conduct has given the 'plaintiff a reasonable expectation that [the defendant] will defend the suit on the merits' or 'cause[d] the court to go to some effort that would be wasted if personal jurisdiction is subsequently found lacking.'" *Id.* (first quoting *Blessing v. Chandrasekhar*, 988 F.3d 889, 896 (6th Cir. 2021); then quoting *Hedeen Int'l, LLC v. Zing Toys, Inc.*, 811 F.3d 904, 906 (7th Cir. 2016); and then quoting *Blessing*, 988 F.3d at 895). Here, the Claimants believe that CSG has waived any objection to personal jurisdiction with respect to the Motions because CSG and its counsel actively participated in the Restructuring and the decision by the Debtor to file a bankruptcy petition, which created the "reasonable expectation" that CSG is subject to the Court's jurisdiction. *Box Alarm Leather, LLC*, 2023 WL 9197952, at *2 (quoting *Hedeen Int'l, LLC*, 811 F.3d at 906). The Court need not weigh in to the legal question of waiver of personal jurisdiction for nonparties because the Court has found specific personal jurisdiction of CSG. *See Eli Lilly & Co. v. Gottstein*, 617 F.3d 186, 195–196 (2d Cir. 2010); Simowitz & Silberman, *supra* note 40.

[53] Attorneys from Hughes Hubbard & Reed LLP and Blanco, Tackabery, Combs & Matamoros, P.A. have appeared on behalf of CSG in the Fraudulent Transfer Proceeding, the Substantive Consolidation Proceeding, and the Fiduciary Duty Proceeding. *See, e.g.*, *Motion for Admission* Pro Hac Vice *for Christopher K. Kiplok* [Adv. Proc. 22-03001; Doc. No. 45] (June 2, 2022).

[54] *See* Mot. to Compel ¶¶ 20, 22; CSG's Objection ¶¶ 31 (citing Beausoleil Decl. Exs. K, at 4–7, L & M), 32.

[55] *See* Beausoleil Decl. Exs. N, O, P & Q.

opted to receive service.[56] While CSG has frequently contested personal jurisdiction,[57] CSG's many contacts in the United States, particularly its considerable level of involvement in the Restructuring and the decision by the Debtor to file a bankruptcy petition, gave it "fair warning" that it would be subject to the Court's jurisdiction. *Trimble Inc.*, 997 F.3d at 1155 (citing *Quill Corp.*, 504 U.S. at 308). Ultimately, CSG's engagement with the United States far exceeds the demands of the "minimum contacts" test, and so the Court may exercise specific personal jurisdiction over CSG. *Goodyear Dunlop Tires Operations*, 564 U.S. at 923 (quoting *Int'l Shoe Co.*, 326 U.S. at 316).

**B. Preliminary Injunction.**

10. In the Motion to Compel, the Claimants sought a modification of the Preliminary Injunction to "to remove CSG as a Protected Party" if the Court concluded that it lacked personal jurisdiction over CSG. *See* Mot. to Compel at 29. Before the Court issued the Preliminary Injunction in 2021, a three-day hearing was held that included: "(a) opening statements and arguments from the Debtor, the [ACC], and the [FCR]; (b) live testimony from two expert witnesses on certain financial and restructuring matters [and] (c) . . . proffers of . . . evidence" such as declarations by the Debtor and numerous exhibits. Preliminary Injunction ¶ 18. The Court conducted a thorough analysis of, and devoted a conservable amount of time to, the issues at hand in the Preliminary Injunction Motion before granting the Preliminary Injunction on August 11, 2021. Generally, a preliminary injunction serves "the debtor's need for a breathing spell from the

[56] CSG agreed to "accept service of discovery requests and subpoenas with respect to the Adversary Proceedings" in the Stipulation. Stipulation ¶ 8. CSG is also one of the Protected Parties, and therefore an indirect beneficiary of the Preliminary Injunction. *See* Preliminary Injunction Motion App. B.

[57] *See supra* notes 38–39.

distraction of other litigation." *In re Purdue Pharma L.P.*, 666 B.R. 461, 473 (Bankr. S.D.N.Y. 2024).[58]

11. Here, the Preliminary Injunction protects the Debtor by preventing "non-debtor litigation [from] interfer[ing] with the debtors' reorganization efforts." *In re Brier Creek Corp. Ctr. Assocs. Ltd.*, 486 B.R. 681, 694 (Bankr. E.D.N.C. 2013). As recognized by Judge Whitley in the Preliminary Injunction, removing CSG from the list of parties protected by the Preliminary Injunction may negatively impact the estate by enabling the "continued litigation of DBMP Asbestos Claims against Protected Parties in the tort system . . . [that] would undoubtedly interfere with, and almost surely end, the Debtor's reorganization." Preliminary Injunction ¶ 280. More importantly, the primary purpose of the Preliminary Injunction is to benefit the Debtor by giving the Debtor and affiliates "breathing spell from the distraction of other litigation" in order to reach a confirmable plan and effectuate a § 524(g) trust. *In re Purdue Pharma L.P.*, 666 B.R. at 473.

12. Although the Preliminary Injunction may also benefit CSG, that benefit is secondary and incidental to the Court's duty to "maximiz[e] the value of the bankruptcy estate" and support the "reorganizing and restructuring [of a debtor's] debts." *Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 272 (2024) (quoting *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 51 (2008)). The Preliminary Injunction is essential to "provid[ing] all claimants — including future claimants who have yet to institute litigation — with an efficient means through which to equitably resolve their claims." *In re Bestwall LLC*, 606 B.R. 243, 257 (Bankr. W.D.N.C. 2019), *aff'd*, No. 3:20-CV-103, 2022 WL 67469 (W.D.N.C. Jan. 6, 2022), *aff'd*, 71 F.4th 168 (4th Cir. 2023). The Preliminary Injunction paves the way for a § 524(g) trust to

[58] *See also Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 222 (2024) (finding in the context of confirmed plan under 11 U.S.C. § 524(g)(4)(A)(ii) for "asbestos-related bankruptcies—and only for such bankruptcies," "[t]hat the code *does* authorize courts to enjoin claims against third parties without [the claimants] consent" (emphasis in original)).

resolve all asbestos claims against the Debtor fairly and efficiently, which should be the Debtor's primary objective. Therefore, the Court will not disrupt CSG's status as a Protected Party in the Preliminary Injunction in the context of a discovery dispute and thus declines to modify the Preliminary Injunction at this time.

**C. The Denial Order.**

13. The Denial Order held that granting the Claimants' first *Motion to Compel*,[59] filed in 2024, would be "premature" until (1) "CSG responds to the subpoena" and (2) "the U.S. Defendants produce their own files in accordance with the discovery plan."[60] Denial Order ¶ 6. "Whether to grant or deny a motion to compel is generally left within the district court's broad discretion." *Nat'l Fire Ins. Co. of Hartford v. Jose Trucking Corp.*, 264 F.R.D. 233, 236 (W.D.N.C. 2010) (citing *Lone Star Steakhouse and Saloon, Inc. v. Alpha Va., Inc.*, 43 F.3d 922, 929 (4th Cir. 1995). As for the Denial Order's first requirement, CSG has answered the CSG Subpoenas by refusing to produce in accordance with the Federal Rules of Civil Procedure. *See* Motion to Compel ¶ 18; Beausoleil Decl. Exs. E & F ("[T]he French Blocking Statute forbids production of the documents and information sought except under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters.").

14. As for the second requirement, the Debtor and Non-Debtor U.S. Defendants "have not completed production of their own files, which contain certain CSG documents dispatched to or received from CSG," but they continue to "negotiate search terms" with the Claimants. Debtor's Objection at 2; *see also* Hr'g Tr. 20:7-13, July 28, 2026. Although full compliance with this second

[59] *Motion of the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative to Compel the U.S. Defendants to Produce Documents* [Adv. Proc. No. 21-03023, Doc. No. 302; Adv. Proc. No. 22-03000, Doc. No. 243; Adv. Proc. No. 22-03001, Doc. No. 211] (May 6, 2024) (the "2024 Motion to Compel").

[60] "Until both events occur according to their respective timelines, these Motions to Compel are unripe for determination." Denial Order ¶ 6.

requirement has not yet been achieved, significant progress has been made towards the production of the U.S. Internal Evidence and the U.S-CSG Evidence by the Debtor and the Non-Debtor U.S. Defendants.[61]

15. While the Debtor and the Non-Debtor U.S. Defendants have made a commendable amount of progress towards production, the Court continues to abide by the Denial Order's second requirement that "the U.S. Defendants produce their own files" before addressing the Claimants arguments on possession, custody, or control. Denial Order ¶ 6. Therefore, the Court need not address, at this time, the Claimants' assertion that the Debtor and Non-Debtor U.S. Defendants maintain possession, custody, or control over the CSG Exclusive Evidence.[62] *See* Mot. to Compel

[61] The Non-Debtor U.S. Defendants have "made clear that, notwithstanding their objections, to the extent non-privileged responsive documents of CSG are in the files of the Non-Debtor Defendants, including those located through searches of agreed-upon U.S. document custodians and therefore within the Non-Debtor Defendants' PCC, such documents would be produced." Non-Debtor U.S. Defendants' Objection ¶ 2.

[62] "A party may serve on any other party a request" for documents, electronically stored information, or other items within "the responding party's possession, custody, or control." FED. R. CIV. P. 34(a). The Claimants cite to several federal district court cases in the Fourth Circuit for authority that the phrase "possession, custody, or control" is best understood as encompassing a party's "practical ability to obtain" the requested materials. *See, e.g.*, *Ultra-Mek, Inc. v. Man Wah (USA), Inc.*, 318 F.R.D. 309, 312 (M.D.N.C. 2016) ("In light of these circumstances, the practical-ability-to-obtain test, as opposed to the legal-right-to-documents test, will be used to determine whether documents in the possession of Man Wah's affiliates are under Man Wah's control such that it can be compelled to produce them."); *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 515 (D. Md. 2009) ("The concept of control as interpreted by *In re NTL, Inc. Securities Litigation* in the context of Rule 34 provides the closest analogy to control in connection with a spoliation issue, and applying it to this dispute, I conclude that Tracer/PSI did not have the sufficient legal authority or practical ability to ensure the preservation of documents prepared by Wilson." (citing 244 F.R.D. 179, 191 (S.D.N.Y. 2007))); *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 286 F.R.D. 288, 292 (E.D. Va. 2012) ("In determining whether the party has 'the right, authority or practical ability' to obtain documents from non-parties, courts have looked to several factors in the case of 'related non-parties' such as a parent, sister, or subsidiary corporation. In *Steele Software Systems v. DataQuick Information Systems, Inc.,* 237 F.R.D. 561, 564 (D. Md. 2006), the court first listed three factors, identified in *Afros S.P.A. v. Krauss–Maffei Corporation,* 113 F.R.D. 127, 130 (D. Del. 1986): (1) the corporate structure of the party/non-party, (2) the non-party's connection to the transaction at issue in the litigation, and (3) the degree that the non-party will benefit from the outcome of the case." (quoting *Bush v. Ruth's Chris Steak House, Inc.,* 286 F.R.D. 1, 5–6 (D.D.C. 2012))). "[T]he party seeking production of documents that it contends are in" in the control of the non-moving party bears "the burden of proof." *Ultra-Mek*, 318 F.R.D. at 313. Here, the Claimants believe that the Debtor and Non-Debtor U.S. Defendants have possession, custody, or control of the CSG Exclusive Evidence due to the information technology architecture of CSG and its subsidiaries. *See* Claimants' Reply and Response ¶ 23, 81–84. While the "practical ability to obtain" test appears to be widely adopted in the Fourth Circuit, this Court retains significant doubts as to whether the Debtor or Non-Debtor U.S. Defendants actually have the "practical ability to obtain" the CSG Exclusive Evidence. The

¶ 5. The Court shall grant the Debtor and the Non-Debtor U.S. Defendants a degree of breathing space to continue production of relevant documents and communications. The Court emphasizes the necessity of promptly proceeding with "good-faith effort[s] to resolve discovery issues." *Coleman on behalf of N.C. v. Wake Cnty. Bd. of Educ.*, No. 5:17-CV-00295, 2019 WL 2932740, at *2 (E.D.N.C. July 8, 2019).

16. With that said, it is clear there is an inflection point that is rapidly approaching, whereby Judge Whitley's second requirement may become ripe.[63] *See* Denial Order ¶ 6. The multiple meet-&-confers[64] and the detailed deliberations on search timeframe,[65] custodians,[66] and search terms[67] indicates significant progress on the second requirement of the Denial Order. Therefore, the Court will continue to adhere to the requirements in the Denial Order by denying the Claimants' Motion to Compel without prejudice. A status hearing will be held on February 4, 2027, to discuss the progress in the discovery process with respect to the production of the U.S. Internal Evidence and the U.S.-CSG Evidence by the Debtor and Non-Debtor U.S. Defendants.

---

Court is not convinced that the Claimants have adequately borne the burden of proof, but the Court need not address the issue in this Order. Instead, the Claimants may purse the CSG Exclusive Evidence from CSG in accordance with the Hague Evidence Convention procedures, while at the same time pursuing the U.S. Internal Evidence and U.S.-CSG Evidence from the Debtor and the Non-Debtor U.S. Defendants in accordance with the Federal Rules for Civil Procedure.

[63] The Court is encouraged by the Claimants and the Debtor's asserted consensual resolution of *The Official Committee of Asbestos Personal Injury Claimants' and the Future Claimants' Representative's Motion for a Finding of Waiver of Privilege or Immunity and for an Order Compelling the Debtor to Produce Withheld Documents*. [Case No. 20-30080, Doc. No. 3584] (Aug. 13, 2026).

[64] *See* CSG's Objection ¶ 31–35; Claimants' Reply and Response ¶ 30 ("The parties met on June 6, July 21, and November 5, 2025, addressing discovery issues, and exchanged multiple letters in connection with such meetings."); Beausoleil Decl. Ex. Q.

[65] *See supra* note 27.

[66] *See supra* note 28.

[67] *See* Debtor's Objection at 2; *see also* Hr'g Tr. 20:7-13, July 28, 2026; Beausoleil Decl. Ex. N, at 1.

### D. Appointing a Commissioner in Accordance with Chapter II of the Hague Evidence Convention.

17. In its Motion for a Protective Order, CSG asks the Court "to enter a protective order staying the [CSG] Subpoenas and proceeding under the Hague Evidence Convention via a commissioner." Mot. for a Protective Order ¶ 5. Pursuant to Federal Rule of Civil Procedure 23(c)(1), "[a] party or any person from whom discovery is sought may move for a protective order" that "may, for good cause," be issued by a court to "protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1); *see* FED. R. BANKR. P. 7026 ("Fed. R. Civ. P. 26 applies in an adversary proceeding."). In a protective order, a court may "prescrib[e] a discovery method other than the one selected by the party seeking discovery." FED. R. CIV. P. 26(c)(1)(C). Instead of adhering to the discovery procedures enumerated in the Federal Rules of Civil Procedure, CSG seeks the appointment of a commissioner under Chapter II of the Hague Evidence Convention to monitor CSG's production in response to the CSG Subpoenas. FED. R. CIV. P. 26(c)(1)(C); Mot. for a Protective Order ¶ 99. CSG, as "[t]he party seeking a protective order[,] bears the burden of showing 'good cause.'"[68] While "[p]rotective orders pursuant to Rule 26(c) 'should be sparingly used and cautiously granted,'"[69]

---

[68] *Talbot for R. T. v. Kohl's Dep't Stores, Inc.*, No. 7:08-CV-129, 2010 WL 11622807, at *2 (E.D.N.C. Feb. 3, 2010) (quoting *Brittain v. Stroh Brewery Co.*, 136 F.R.D. 408, 412 (M.D.N.C. 1991)); *see also Rich v. KIS California, Inc.*, 121 F.R.D. 254, 257 (M.D.N.C. 1988) ("The proponent of using the Hague Evidence Convention bears the burden of demonstrating the necessity for using those procedures."); *MeadWestvaco Corp. v. Rexam PLC*, No. 1:10CV511, 2010 WL 5574325, at *1 (E.D. Va. Dec. 14, 2010), *aff'd*, No. 1:10CV511, 2011 WL 102675 (E.D. Va. Jan. 10, 2011) ("[T]he burden is on defendants, as proponents of resort to Hague Convention procedures, to persuade the court that Hague Convention procedures are appropriate."). *But cf. Wright v. Csabi* (*In re Wright*), 568 B.R. 770, 777 (Bankr. S.D. Tex. 2017) ("Upon a moving party meeting the burden of both prerequisites, a court has 'broad discretion in fashioning protective orders to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" (quoting BANKR. PROC. MANUAL § 7026:16 (2016 ed.) (internal quotations omitted))).

[69] *Armitage v. Biogen, Inc.*, No. 1:17CV1133, 2019 WL 79037, at *2 (M.D.N.C. Jan. 2, 2019) (quoting *Medlin v. Andrew*, 113 F.R.D. 650, 652 (M.D.N.C. 1987)).

the rule also "confers broad discretion on the trial court to decide when a protective order is appropriate and what degree of protection is required."[70]

18. In 1987, the Supreme Court of the United States directly addressed the issue of whether a discovery request directed at a French company should proceed under the Federal Rules of Civil Procedure or the Hague Evidence Convention. *See Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for S. Dist. of Iowa*, 482 U.S. 522, 525–27 (1987). In its ruling, the Supreme Court of the United States affirmed a lower court ruling in favor of following the Federal Rules of Civil Procedure because "the Hague Convention does not divest the District Court of jurisdiction to order discovery under the Federal Rules of Civil Procedure." *Id.* at 540. While the Supreme Court of the United States ultimately selected the Federal Rules of Civil Procedure in *Aérospatiale*, it did not preclude the use of the Hague Evidence Convention in other situations because "American courts should . . . take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." *Id.* at 546. Lower courts were directed to "supervise pretrial proceedings particularly closely to prevent discovery abuses" when a party "seek[s] evidence abroad." *Id.*

19. Specifically, the United States District Court for the Western District of North Carolina confirmed that "the Hague Convention procedures are not mandatory and exclusive but are intended as a permissive supplement." *Belmont Textile Mach. Co. v. Superba, S.A.*, 48 F. Supp. 2d 521, 524 (W.D.N.C. 1999). Therefore, the case law demonstrates that the procedures in the Hague Evidence Convention supplement, rather than replace, the Federal Rules of Civil Procedure with "no rule of 'first resort,' compelling the discovering party to attempt to utilize the

---

[70] *Baron Fin. Corp. v. Natanzon*, 240 F.R.D. 200, 202 (D. Md. 2006). Still, the "good cause requirement [in Rule 26(c) creates a rather high hurdle for proponents." *Id.*

Convention's procedures before resorting to the Federal Rules." *Schindler Elevator Corp. v. Otis Elevator Co.*, 657 F. Supp. 2d 525, 528 (D.N.J. 2009) (quoting *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 299 (3d Cir. 2004)). While the Third Circuit held that "the Federal Rules are 'the normal methods' for federal litigation involving foreign national parties," courts may continue to utilize "the 'optional' or 'supplemental' Convention procedures" if those procedures "prove to be conducive to discovery." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 300 (quoting *Aérospatiale*, 482 U.S. at 536). While the Hague Evidence Convention procedures are not mandatory, the procedures may be useful, and courts must consider the specific interests of the foreign entity.

20. Importantly, CSG asserts that it is unable to respond to the CSG Subpoenas because "proceeding under Rule 45 would violate the 'French Blocking Statute,'"[71] and subject CSG to potential civil and criminal penalties. Mot. for a Protective Order ¶ 3. Because CSG "asserts foreign law as a bar to production," this Court must "perform a comity analysis to determine the weight to be given to the foreign jurisdiction's law."[72] Addressing the same French Blocking Statute that CSG asserts here, the Supreme Court of the United States identified five comity factors that courts must consider:

> (1) the importance to the . . . litigation of the documents or other information requested;
> (2) the degree of specificity of the request;
> (3) whether the information originated in the United States;
> (4) the availability of alternative means of securing the information; and

---

[71] The "French Blocking Statute" refers to the Loi n° 68-678 du 26 juillet 1968, art. 1 bis [Republic of France Law No. 68–678, dated July 26, 1968], JOURNAL OFFICIEL DE LA RÉPUBLIQUE FRANÇAISE [J.O.] [OFFICIAL GAZETTE OF FRANCE], July 27, 1968 (as amended by Loi n° 80-538 du 16 juillet 1980 [French Law No. 80–538, dated July 16, 1980]). A translation of the official title of the French Blocking Statute is "Relating to the Communication of Economic, Commercial, Industrial, Financial or Technical Documents and Information to Foreign Individuals or Legal Entities."

[72] *Tiffany (NJ) LLC v. Qi Andrew*, 276 F.R.D. 143, 151 (S.D.N.Y. 2011), *aff'd sub nom. Tiffany (NJ) LLC v. Andrew*, No. 10 CIV. 9471, 2011 WL 11562419 (S.D.N.Y. Nov. 14, 2011).

> (5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Aérospatiale*, 482 U.S. at 544 n.28 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 437(1)(c) (Tentative Draft No. 7, 1986)).[73] Courts must analyze the comity factors "irrespective of whether discovery is sought from a litigant or a third party." *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. 833, 851 (Bankr. D. Del. 2009) (quoting *Aérospatiale*, 482 U.S. at 544).

**1. Importance of the Information Requested by the Claimants in the CSG Subpoenas to the Litigation.**

21. To begin the comity analysis, the Court must first assess "the importance . . . of the documents or other information requested" to the case. *Aérospatiale*, 482 U.S. at 544 n.28 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 437(1)(c) (Tentative Draft No. 7, 1986)). This factor "weigh[s] in favor of disclosure" under the Federal Rules of Civil Procedure in cases "[w]here the evidence is directly relevant." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1475 (9th Cir. 1992) (quoting *In re Westinghouse Elec. Corp. Uranium Contracts Litigation,* 563 F.2d 992, 999 (10th Cir. 1977)). Conversely, "courts have generally been unwilling to override foreign secrecy laws" where the "evidence sought is cumulative of existing evidence." *Id.*

22. Here, this factor weighs in favor of the Hague Evidence Convention because it seems unlikely that the Fraudulent Transfer Proceeding and/or the Substantive Consolidation Proceeding "stand or fall on" the CSG Exclusive Evidence sought by the Claimants in the CSG

[73] *See also Linde v. Arab Bank, PLC*, 706 F.3d 92, 109 (2d Cir. 2013) ("[W]here, as here, a party claims that foreign law prevents disclosure, the Court has called for a 'particularized analysis,' . . . and endorsed the factors recognized in a draft of what is now § 442 of the Restatement (Third) of Foreign Relations Law of the United States." (quoting *Aérospatiale,* 482 U.S. at 543)).

Subpoenas. *Id.* Receipt of the CSG Exclusive Evidence by the Claimants is "unlikely to result in a much faster termination of the litigation either through settlement or on the merits."[74] First, the Claimants' lethargic efforts to elicit the CSG Exclusive Evidence leads the Court to believe the Claimants do not view it as essential to the case. Second, the Court infers that some of the "evidence sought" is likely to be "cumulative of existing evidence" because a portion of the information requested by CSG in the CSG Subpoenas may be U.S.-CSG Evidence that is ultimately produced by the Debtor and the Non-Debtor U.S. Defendants.

23. The Claimants' sluggish efforts to compel discovery from CSG suggests that any additional information gleaned from CSG is not likely to be pivotal to the claims made by the Claimants in the Fraudulent Conveyance Proceeding or the Substantive Consolidation Proceeding. The timeline of events bears this out. The Claimants did not issue the CSG Subpoenas until nearly two years after the Court entered the Case Management Order.[75] Within two months of the Claimants issuing the CSG Subpoenas, CSG responded to the Claimants.[76] Thereafter, almost an entire year elapsed before the Claimants reacted to CSG's Response to the CSG Subpoenas by requesting a meet-and-confer.[77] As of the date of entry of this Order, over two years have passed since the Claimants served the CSG Subpoenas on CSG.[78] *See* Mot. to Compel ¶ 35; CSG's Objection ¶ 23.

---

[74] *Memorandum and Order* [Case. No. 20-30080. Doc. No. 3600; Adv. Proc. No. 22-03000, Doc. No. 495; Adv. Proc. No. 22-03001, Doc. No. 424] (Aug. 31, 2026).

[75] *See* Case Management Order (entering order on May 23, 2022); CSG Subpoenas (issuing subpoenas on May 6, 2024).

[76] *See* CSG's Response to the CSG Subpoenas (responding on July 5, 2024).

[77] CSG alleges that the Claimants' first request to meet-and-confer following CSG's Response to the CSG Subpoenas arrived on May 29, 2025, but exhibit K of the Beausoleil Declaration includes a short email from the Claimants, dated March 5, 2025, in which the Claimants request a meet-and-confer regarding discovery issues. *See* Beausoleil Decl. Ex. K, at 3-7.

[78] Although email traffic between CSG and the Claimants indicates that some progress was made in the second half of 2025, it appears that negotiations broke down in early 2026. *See* Mot. for a Protective Order ¶ 38; Beausoleil Decl. Ex. Q, at 1-3.

24. The lack of urgency by the Claimants suggests that the Claimants believe the CSG Exclusive Evidence will be of limited utility in the litigation.[79] *See Seoul Semiconductor Co. v. Nichia Corp.*, 590 F. Supp. 2d 832, 835 (E.D. Tex. 2008) ("Defendants' delay in requesting documents from, and deposition of, Mr. Lapoux indicates to the court that they may not be as important as Defendants claim."). Any further delay caused by the Hague Evidence Convention procedures are likely to be negligible when compared to the delays that have already accrued. The Court understands the Claimants' concerns that the Hague Evidence Convention may become unduly burdensome,[80] but the very slow pace of progress in the discovery process here lends credence to the Court's belief that the Hague Evidence Convention may help to finally generate sustainable momentum towards the production of the CSG Exclusive Evidence.

25. Second, there is likely to be some overlap between the evidence sought by the Claimants from the Debtor, the non-Debtor U.S. Defendants, and CSG. While the CSG Exclusive Evidence is only available from CSG,[81] portions of CSG's production under the Hague Evidence Convention procedures in response to the CSG Subpoenas may be "cumulative of existing evidence." *Richmark*, 959 F.2d at 1475. CSG's production in response to the CSG Subpoenas,

---

[79] This does not mean that the discovery process has devolved into "a 'fishing expedition[,]'" as alleged by CSG. *Howard v. Coll. of the Albemarle*, No. 2:15-cv-00039, 2016 WL 4384658, at *3 (E.D.N.C. Aug. 16, 2016) (quoting *Sandcrest Outpatient Servs., P.A. v. Cumberland Cnty. Hosp. Sys., Inc.*, 853 F.2d 1139, 1147 (4th Cir. 1988)).

[80] Some courts have opined that discovery under the Hague Evidence Convention is more "cumbersome[,]" "unduly time consuming[,]" and "less certain to produce needed evidence than direct use of the Federal Rules." *MeadWestvaco Corp.*, 2010 WL 5574325, at *2 (quoting *Valois of Am., Inc. v. Risdon Corp.*, 183 F.R.D. 344, 349 (D. Conn. 1997) (finding that courts have "generally recognized that procedures under the Hague Convention are far more cumbersome than under the Federal Rules of Civil Procedure."); *Aérospatiale*, 482 U.S. at 542 ("In many situations the Letter of Request procedure authorized by the Convention would be unduly time consuming and expensive, as well as less certain to produce needed evidence than direct use of the Federal Rules."); *see also In re Glob. Power Equip. Grp. Inc.*, 418 B.R. at 848 ("Using the Hague Procedures will create a substantial risk of undue delay and expense."); *Trueposition, Inc. v. LM Ericsson Tel. Co. (Telefonaktiebolaget LM Ericsson)*, Civ. Action No. 11–4574, 2012 WL 707012, at *5 (E.D. Pa. Mar. 6, 2012) ("[T]he procedures required pursuant to the Hague Evidence Convention are much more likely to be time-consuming than the procedures under the Federal Rules.").

[81] *See supra* note 62 (discussing "possession, custody, or control").

excluding the CSG Exclusive Evidence, should be cumulative of the U.S.-CSG Evidence produced by the Debtor and the Non-Debtor U.S. Defendants. In fact, the Court acknowledges that the wording of the requests in the CSG Subpoenas mimics the language used in the 2023 Discovery Requests sent to the Debtor and the Non-Debtor U.S. Defendants;[82] "Of the 26 requests for production in the [CSG] Subpoenas, 22 are identical, or substantially similar, to the requests that Plaintiffs have already served on the direct Defendants in the Fraudulent Conveyance Proceeding[, and the] other four requests are identical, or substantially similar, to the requests that Plaintiffs have already served on the direct defendants in the Substantive Consolidation Proceeding." CSG's Objection ¶ 67.[83] While the Court does not, and could not, reach CSG's conclusion that the documents and communications in the CSG Exclusive Evidence are "peripheral and few,"[84] the apparent cumulative nature of the non-CSG Exclusive Evidence suggests it is duplicative. The cumulative nature of much of the evidence weighs in favor of the Hague Evidence Convention procedures.

26. While the wording of the 2023 Discovery Requests and the CSG Subpoenas is duplicative, this repetition is not fatal to the Claimants' requests in the CSG Subpoenas because the information and documents ultimately produced by the Debtor, the Non-Debtor U.S. Defendants, and CSG may materially differ. *See* CSG's Objection Ex. A. The Claimants emphasize that the CSG Exclusive Evidence, which may be relevant in both the Fraudulent Conveyance

---

[82] *See also* CSG's Objection Ex. A.

[83] *See Tiffany (NJ) LLC*, 276 F.R.D. at 158 ("The Banks' status as non-parties weighs against compelling production of documents in violation of Chinese law because such an order should be imposed on a nonparty . . . only in extreme circumstances" (internal quotations omitted)).

[84] Mot. for a Protective Order ¶ 74; *see also* Mot. for a Protective Order ¶ 58. Because the Claimants have not exhausted their attempts to collect the U.S.-CSG Evidence from the Debtor and Non-Debtor U.S. Defendants, the Court is unable to precisely discern what percentage of the U.S.-CSG Evidence may ultimately coincide with the evidence that CSG produces in response to the CSG Subpoenas.

Proceeding and the Substantive Consolidation Proceeding, is only available from CSG.[85] The Court concedes that CSG's exclusive possession of the CSG Exclusive Evidence weighs in favor of utilizing the Federal Rules of Civil Procedure, but an overall assessment of the low criticality of the information requested from CSG, as evidenced by the Claimant's lethargic efforts to collect the same, weighs slightly in favor of the proceeding under the Hague Evidence Convention.

**2. Broad and Generalized Nature of the CSG Subpoenas.**

27. CSG believes that the "[v]ast majority" of the requests in the CSG Subpoenas are "[b]road and [g]eneral[,]"[86] whereas the Claimants' believe the discovery dispute has been "further narrowed to CSG-only documents and those missing from CSG's American affiliates."[87] Several district courts have found that "[b]road, generalized requests for information weigh in favor of utilizing Hague procedures."[88] Narrow requests, such as a "limited" deposition or an inquiry into particular categories of information, favor the Federal Rules of Civil Procedure because "a narrow or limited discovery request is less intrusive to the target country than a broad or general discovery request."[89]

28. Here, the CSG Subpoenas include twenty-six requests that seek information about a range of topics from "the selection, appointment, or assignment of individuals who were

---

[85] *See supra* note 62 (detailing the Claimants arguments over "possession, custody, or control"). The Claimants are requesting the CSG Exclusive Evidence directly from CSG in an attempt to establish intent in the Fraudulent Transfer Proceeding given the alleged "approval from Paris" before the Restructuring was executed. Final Referee Report App. C, at No. 1623.

[86] Mot. for a Protective Order, at 21.

[87] Claimants' Reply and Response ¶ 45.

[88] *Salt River Project Agric. Improvement & Power Dist. v. Trench France SAS*, 303 F. Supp. 3d 1004, 1008 (D. Ariz. 2018); *see also Behrens v. Arconic, Inc.*, No. CV 19-2664, 2020 WL 1250956, at *5 (E.D. Pa. Mar. 13, 2020) (finding a request "very broad, which favors use of the Hague Convention").

[89] *Swapalease, Inc. v. Sublease Exchange.com, Inc.*, No. 1:07-CV-45, 2008 WL 11355018, at *4 (S.D. Ohio Sept. 19, 2008); *see Spyder Games LLC v. Mementum Lab Sas*, No. 5:25-CV-10248, 2026 WL 2196269, at *3 (N.D. Cal. July 29, 2026) (disfavoring the Hague Evidence Convention if a request "targets 'particular categories' of information that pertain to the analysis of the parties' copyright and trademark claims" (quoting *Connex R.R. LLC v. AXA Corp. Sols. Assurance*, No. CV1602368, 2017 WL 3433542, at *13 (C.D. Cal. Feb. 22, 2017))).

seconded to DBMP" to "the drafting, negotiation, or review of all intercompany agreements related to the Restructuring." Mot. to Compel Ex. F. Through the expansive set of requests in the CSG Subpoenas, the Claimants seek to clarify CSG's rationale and decision-making process behind the Restructuring and the Debtor's Chapter 11 bankruptcy petition. Like the requests that supported the appointment of a commissioner in *Salt River*, the CSG Subpoenas are a "broad requirement for the production of relevant information." *Salt River Project Agric. Improvement & Power Dist. v. Trench France SAS*, 303 F. Supp. 3d 1004, 1008 (D. Ariz. 2018). Accordingly, the moderately "[b]road, generalized requests" in the CSG Subpoenas weigh in favor of adhering to the Hague Evidence Convention procedures. *Salt River*, 303 F. Supp. 3d at 1008.

29. Although the requests in the CSG Subpoenas are considered broad under the Hague Evidence Convention standard, the requests are not so sweeping as to constitute a "fishing expedition"[90] because the requests are limited to the specific time of January 1, 2017, to June 30, 2020. *See* CSG Subpoenas ¶ 2; Beausoleil Decl. Ex. Q, at 4. What constitutes "broad and generalized" under a Hague Evidence Convention comity analysis is distinct from an assessment of what constitutes "overbroad" in the context of the Federal Rules of Civil Procedure.[91] While the requests in the CSG Subpoenas may be broad in terms of the depth of questioning related to the Restructuring, the CSG Subpoenas are not so expansive as to seek "information beyond what the requesting party reasonably requires." *Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 190 (4th Cir. 2019). As discussed in subsection E of this Order, the Court finds that although the twenty-six requests in the CSG Subpoenas are extensive, twenty-four of the twenty-six requests are

[90] *Howard*, 2016 WL 4384658, at *3 (quoting *Sandcrest Outpatient Servs., P.A.*, 853 F.2d at 1147).

[91] *Compare Gilmore v. Jones*, 339 F.R.D. 111, 123 (W.D. Va. 2021) ("In evaluating whether the scope of a subpoena is overbroad, courts must ensure that the requested information is relevant to the truth or falsity of the particular statements at issue."), *with Virginia Dep't of Corr. v. Jordan*, 921 F.3d 180, 190 (4th Cir. 2019) (finding a request overbroad if it "seeks information beyond what the requesting party reasonably requires").

reasonable and relevant to claims made by the Claimants in the Fiduciary Duty Proceeding and Substantive Consolidation Proceeding.

**3. Origination of the CSG Exclusive Evidence.**

30. The Federal Rules of Civil Procedure are favored if the documents and information sought "originated in the United States." *Aérospatiale*, 482 U.S. at 544 n.28. This factor takes into account the origin of information rather than its current location.[92] The Hague Evidence Convention procedures are favored "[i]f all of the information to be disclosed and the persons who will produce the information are located in the foreign country, . . . because 'those people and documents are subject to the law of that country in the ordinary course of business.'" *Salt River*, 303 F. Supp. 3d at 1008 (quoting *Richmark*, 959 F.2d at 1475). This analysis has two important components: (1) the physical location where the documents were "created" and (2) the nationality of the entity that "retained control over the documents."[93]

31. Here, CSG believes this factor clearly favors the Hague Evidence Convention because the "target communications . . . originated from CSG, which is headquartered in France."[94] The Claimants counter by arguing that "a French company directing a reorganization of its U.S. subsidiary cannot shield its own communications from production in a litigation relating to the purposes, planning, and implementation of that reorganization."[95] The Court finds CSG's argument more persuasive as to this comity factor. First, CSG primarily "created" the CSG Exclusive

[92] *S.E.C. v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 333 (N.D. Tex. 2011) (emphasis in original) (quoting *Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 209 (E.D.N.Y. 2007) (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 437(1)(c))).

[93] *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. at 848; *see also Knight Cap. Partners Corp. v. Henkel Ag & Co., KGaA*, 290 F. Supp. 3d 681, 690 (E.D. Mich. 2017) (favoring the Federal Rules of Civil Procedure because "at least some of the documents probably originated [in the U.S.] since some requests concern communications between Henkel Global and [U.S.] counter-parties to the deal").

[94] Mot. for a Protective Order ¶ 68.

[95] Claimants' Reply and Response ¶ 46.

Evidence in France evidenced by the fact that the central nerve of CSG's decision-making during the Restructuring, and the corresponding digital evidence produced to effectuate those decisions, transpired in France.[96] *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. at 848. While the Claimants correctly note that the specific business transactions necessary for the Restructuring were executed in the United States,[97] a significant portion of the CSG Exclusive Evidence was created by French citizens[98] who were employed by a French company[99] while living and working in France.[100] CSG contends that much of the CSG Exclusive Evidence was also written in the French language.[101]Furthermore, CSG is a French company and "retained control" over the computers and information technology stack that hosted the documents and communications of its officers and executives.[102] *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. at 848. Regardless of the physical

---

[96] *See supra* note 45 (detailing CSG's role in the Restructuring in the Final Referee Report).

[97] *See* Mot. to Compel ¶¶ 29, 39 ("CSG, along with its domestic affiliates, specifically took advantage of one state's divisive merger laws (Texas), and participated in planning for the Debtor to voluntarily file for bankruptcy in a second state (North Carolina) under U.S. bankruptcy law.").

[98] Beausoleil Decl. Ex. Q, at 4 (listing the Claimants' requested custodians as Antoine Vignial [CSG's General Counsel & Secretary], Sreedhar Natarajan [CSG's former CFO and current Senior Vice President & CEO of Asia-Pacific & India], Hubert Reichardt [CSG's Director of Audit, Risks & Internal Control], Pierre André De Chalendar [CSG's former CEO and Current Honorary Chairman], Benoit Bazin [CSG's Chairman & CEO], Daniel Biarneix [CSG's Financial Director], Gaby Kelhetter-Amette [CSG's Director of Consolidation and Group Reporting], Guillaume Texier [CSG's former Senior Vice President & CFO], Laurence Pernot [CSG's Vice President of Communications], Jean-François Phelizon [CSG's former Senior Vice President and current Senior Advisor to Chairman & CEO]).

[99] CSG is a French company with its headquarters in Courbevoie, France. Mot. for a Protective Order ¶ 6.

[100] *See, e.g.*, Mot. to Compel ¶ 29 (describing a trip in May 2018 by Antoine Vignial and Guillaume Texier to visit Goodwin Proctor's New York Office); *id.* (describing emails and virtual weekly meetings with Non-Debtor U.S. Defendants implying that most of CSG employees were overseas with some seconded and expatriated employees, such as Eric Placidet and Jean-Francois Phelizon, that worked in the offices of Non-Debtor U.S. Defendants); Final Referee Report App. B, at No.143 (describing Antoine Vignial's "responses include comments and questions that show the level of involvement of Paris team in decision making").

[101] A hit list of search terms that CSG ran was exchanged on August 12, 2025, following the Claimants' request for "French language terms" to be included in discussions with the Debtor and Non-Debtor U.S. Defendants on May 29, 2025. *See* Beausoleil Decl., Ex. N at 1, 9.

[102] *See* Claimants' Reply and Response, at 11 n.40 ("'[T]he North America ITS team [can] request documents of the Paris IT team' when using Microsoft Teams and that 'ITS North America team member[s] may request that [Paris IT] share' documents" (quoting Thomas Pier Dep. 135:2–136:4, Apr. 25, 2024)); Hr'g Tr. 41:17-19 (stating an assertion by the Claimants that "[e]mails of all of the defendants, the U. S Defendants, as well as CSG are exclusively held at CSG's Technology Department").

location of the digital documents and communications in question, CSG had a reasonable expectation that the documents and commutations were "'subject to the law of [France] in the ordinary course of business.'" *Salt River*, 303 F. Supp. 3d at 1008 (quoting *Richmark*, 959 F.2d at 1475). This factor does not turn on the disputed[103] and fact-intensive question of the physical location of the CSG Exclusive Evidence,[104] but rather on where the evidence originated and who controlled it. Because the CSG Exclusive Evidence "originated" in France and was controlled by a French entity, this factor weighs heavily in favor of utilizing the Hague Evidence Convention. *See Strauss v. Credit Lyonnais, S.A.*, 242 F.R.D. 199, 209 (E.D.N.Y. 2007).

**4. Existence of Alternative Means to Secure the Information and Evidence.**

32. The Hague Evidence Convention is favored if the requesting party has several "alternative means of securing the information." *Aérospatiale*, 482 U.S. at 544 n.28. In such instances where the "information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law." *Richmark*, 959 F.2d at 1475. Here, the Claimants assert that the CSG Exclusive Evidence, which may reveal CSG's motivations and internal deliberations about the Restructuring, cannot be obtained elsewhere.[105] Claimants' Reply and

---

[103] The Claimants and CSG dispute the physical location of the data due to the implications of a cloud-based information technology environment.

[104] The facts presented on the record do not indisputably establish the physical location (or locations) of the electronically stored information due to the cloud network used by CSG and its subsidiaries during the timeframe in question. *See* Claimants' Reply and Response ¶ 23. Conflicting evidence indicates that the location would depend on the terms of service for CSG's contract with its cloud service provider and the specific implementation of CSG's network configuration. *Id.*

[105] To reiterate, the CSG Exclusive Evidence is necessarily exclusive to CSG because it has not been shared with or communicated to the Debtor or Non-Debtor U.S. Defendants. The Court sets aside the Claimants arguments regarding the Debtor's and the Non-Debtor U.S. Defendants' alleged possession, custody, or control of evidence. *See supra* note 62 (detailing the Claimants arguments over "possession, custody, or control").

Response ¶ 45. The Claimants further assert that the Hague Evidence Convention will place excessive limits on the scope of discovery and result in a very slow production process.[106]

33. Although the exclusivity of the CSG Exclusive Evidence might appear to favor the application of the Federal Rules of Civil Procedure, the Court must weigh that against the prospect that some of CSG's production in response to the CSG Subpoenas, specifically the non-CSG Exclusive Evidence, may be duplicative of the U.S.-CSG Evidence produced by the Debtor and the Non-Debtor U.S. Defendants.[107] In short, the Claimants can utilize the Federal Rules of Civil Procedure to procure the U.S. Internal Evidence and the U.S.-CSG Evidence from the Debtor and the Non-Debtor U.S. Defendants,[108] while utilizing the Hague Evidence Convention procedures to pursue the evidence sought from CSG through the CSG Subpoenas. The Court believes that any added burden caused by the Hague Evidence Convention can be managed with the specific procedural guardrails implemented in this Order, and subsequent orders as necessary.[109]

---

[106] *See Skillz Platform Inc. v. Papaya Gaming, Ltd.*, 753 F. Supp. 3d 347, 357 (S.D.N.Y. 2024), *reconsideration denied*, No. 24CV1646, 2024 WL 4839405 (S.D.N.Y. Nov. 20, 2024) (finding that use of the Hague Evidence Convention procedures might "delay this matter's adjudication" and "prevent full discovery from taking place at all").

[107] *See* CSG's Objection ¶ 67 ("Of the 26 requests for production in the Subpoenas, 22 are identical, or substantially similar, to the requests that Plaintiffs have already served on the direct Defendants in the Fraudulent Conveyance Proceeding[, and the] other four requests are identical, or substantially similar, to the requests that Plaintiffs have already served on the direct defendants in the Substantive Consolidation Proceeding."); CSG's Objection Ex. A. Furthermore, the Claimants are actively "working through" any remaining discovery disputes regarding the U.S.-CSG Evidence from the Debtor and Non-Debtor U.S. Defendants. Hr'g Tr. 20:12, July 28, 2026; *see* Debtor's Objection at 2.

[108] The Federal Rules of Civil Procedure will be "be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive" production of evidence. FED. R. CIV. P. 1.

[109] *See infra* subsection F. The Court will attempt to keep CSG's production on track by clearly establishing the scope of discovery in the Request, giving clear directives to the commissioner, conducting commissioner oversight through bi-monthly status reports, and issuing further guidance in the form of subsequent Court orders if the commissioner is unable to mediate any disputes that arise.

**5. Interests of the United States and France.**

34. Courts "must balance the national interests of France and the United States, and determine whether those interests favor application of the Hague Procedures or the Federal Rules." *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. at 848. This requires courts to engage in a "particularized analysis of the respective interests of the foreign nation and the requesting nation." *Aérospatiale*, 482 U.S. at 543–44. When conducting a comity factor analysis, a court "must assess the interests of each nation in requiring or prohibiting disclosure, and determine whether disclosure would 'affect important substantive policies or interests' of either the United States or the [foreign nation]." *Richmark*, 959 F.2d at 1476 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442 cmt. c). "American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state."[110] *Aérospatiale*, 482 U.S. at 546. Specifically, a court must consider "the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." *Aérospatiale*, 482 U.S. at 544.

35. An assessment of this delicate balance begins with an acknowledgement that the United States has a generalized but "strong interest in avoiding conflict with foreign nations." *Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d at 335 (citations omitted). Moreover, "the United States has 'a substantial interest in fully and fairly adjudicating matters before its courts.'" *Strauss*, 249 F.R.D. at 214 (citing *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 524 (S.D.N.Y.

---

[110] Whereas CSG is a privately owned company, the French entities in *Aérospatiale* "were corporations owned by the Republic of France, so for all practical purposes a foreign sovereign was a party in the lawsuit." *Mississippi Poultry Ass'n, Inc. v. Madigan*, 992 F.2d 1359, 1367 (5th Cir.), *amended*, 9 F.3d 1113 (5th Cir. 1993), *on reh'g*, 31 F.3d 293 (5th Cir. 1994). This heightened the risk that "application of American law would directly affect the sovereignty of a foreign nation." *Id.*

1987)).[111] In pursuit of fair and equitable adjudication, some courts have found a strong U.S. "interest in 'vindicating the rights of American plaintiffs' and preserving fairness in litigation by requiring equal disclosure from the parties." *Salt River*, 303 F. Supp. 3d at 1009 (quoting *Richmark*, 959 F.2d at 1477). Likewise, in the bankruptcy court context, the United States has "an interest in securing the prompt, economical and orderly administration of its bankruptcy cases." *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. at 848. On the other hand, some courts have cautioned that, "[i]n weighing the United States' interests, courts, among other things, 'should take into account not merely the interest of the prosecuting or investigating agency in the particular case, but the long-term interests of the United States generally in international cooperation in law enforcement and judicial assistance, in joint approach to problems of common concern, in giving effect to formal or informal international agreements, and in orderly international relations.'"[112] *Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d at 335 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 442 cmt. c).

36. In the case at hand, the generic U.S. interests contrast with France's specific interest in upholding the French Blocking Statute. Article 1A of the French Blocking Statute specifically "prohibit[s] . . . any party to request, seek or disclose, in writing, orally or otherwise, economic, commercial, industrial, financial or technical documents or information leading to the constitution of evidence with a view to foreign judicial or administrative proceedings or in connection

[111] The United States also "has an obvious interest in the application of its procedural rules to discovery" when the underlying allegations in the case involve violations of U.S. law and threaten to deprive U.S. creditors of just and timely relief. *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02CIV5571, 2006 WL 3378115, at *3 (S.D.N.Y. Nov. 16, 2006).

[112] Courts have held that the United States has an especially strong interest in matters related to terrorism and antitrust, neither of which applies here. *See Strauss*, 242 F.R.D. at 213 ("The mutual interests of the United States and France in combating terrorism outweigh the French interest, if any, regarding the disputed discovery."); *Minpeco, S.A. v. Conticommodity Servs., Inc.*, 116 F.R.D. 517, 523 (S.D.N.Y. 1987) ("The United States has a strong national interest in enforcing its antitrust and commodities fraud laws.").

therewith[,]" unless the request adheres "to treaties or international agreements and applicable laws and regulations." *Aérospatiale*, 482 U.S. at 526 n.6 (quoting a translation of the French Blocking Statute). The French Blocking Statute is a clear "expression[] of interest by the foreign state." *Richmark*, 959 F.2d at 1476 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442 cmt. c). The French Blocking Statute "do[es] not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 304 (quoting *Aérospatiale*, 482 U.S. 544 n.29). This does not mean the French Blocking Statute is irrelevant or can be dismissed out of hand. *See Salt River*, 303 F. Supp. 3d at 1009 ("By enacting the Blocking Statute, France has expressed an 'emphatic' sovereign interest in 'controlling foreign access to information within its borders, and in protecting its citizens from foreign discovery practices it views as antithetical to the French legal culture.'" (quoting *In re Perrier Bottled Water Litig.*, 138 F.R.D. 348, 355 (D. Conn. 1991); then quoting *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944-SC, 2014 WL 5462496, at *6) (N.D. Cal. Oct. 23, 2014))). Rather, the French Blocking Statute is just one mechanism that France uses to protect its interests. *See Aérospatiale*, 482 U.S. at 546. France has an interest in protecting the privacy and security of its sovereigns, especially when a foreign court is seeking information from a French entity that has not been shared with foreigners, as is the case with the CSG Exclusive Evidence. *Id.* ("American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position.").

37. Before attempting to weigh the interests, a "[c]ourt must first determine 'whether [foreign] law actually bars the production at issue.'" *Concepts NREC, LLC v. Qiu*, 662 F. Supp. 3d

496, 523 (D. Vt. 2023), *objections overruled*, 698 F. Supp. 3d 698 (D. Vt. 2023) (quoting *Republic Techs. (NA), LLC v. BBC Tobacco & Foods, LLP*, No. 16 C 3401, 2017 WL 4287205, at *1 (N.D. Ill. Sept. 27, 2017)). The French Blocking Statute is applicable in this situation because the Claimants are seeking documents and information from CSG, a French company with its headquarters in Courbevoie, France. The French Government's preference for applying the Hague Evidence Convention was confirmed when CSG received a response from SISSE that stated the French Blocking Statute is "applicable" because "[t]he request for the production of documents before the competent court in the Western District of North Carolina is aimed at gathering evidence for legal proceedings." Mot. for a Protective Order ¶ 28; SISSE Letter, at 1.[113] Additionally, CSG believes "the risk of prosecution is heightened in this case"[114] "because Article 40 of the French Code of Criminal Procedure makes French civil servants 'legally obligated to report a breach of the Statute to the prosecutor.'"[115]

38. The Court recognizes the difficulty of balancing the amorphous interests of the U.S. with the specific, but often unenforced, interests of France. At least one U.S. bankruptcy court has found that the United States' interests always outweigh any interest that France has in its French Blocking Statute,[116] and a plethora of other courts have found sparse enforcement of the French Blocking Statute.[117] Conversely, this Court is careful to not needlessly brush aside a potential

[113] CSG believes that the SISSE Letter rises to an "expressions of interest by the foreign state." *Richmark*, 959 F.2d at 1476 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 442 cmt. c).
[114] Mot. for a Protective Order ¶ 30 (quoting *Declaration of Stéphane de Navacelle* ¶ 16 [Adv. Proc. No. 21-03023, Doc. No. 475; Adv. Proc. No. 22-03000, Doc. No. 415] (June 15, 2026) (the "Navacelle Declaration")).
[115] CSG's Reply ¶ 47 (quoting Navacelle Decl. ¶ 16).
[116] *See Enron Corp. v. J.P. Morgan Securities Inc.* (*In re Enron Corp.*), No. 01-16034, 2007 WL 8317419, at *3 (Bankr. S.D.N.Y. July 18, 2007) ("[T]he interest of the United States to apply its procedural rules for discovery for the purpose of adjudicating fully and completely matters before its courts outweighs the interest of France's enactment of the French Blocking Statute.").
[117] *See, e.g.*, *Proofpoint, Inc. v. Vade Secure, Inc.*, No. 19CV04238, 2020 WL 1911195, at *6 (N.D. Cal. Apr. 20, 2020) ("[T]here is no evidence that France's interest in its blocking statute has changed or that France has become more vigorous in enforcing its blocking statute in recent years."); *Salt River*, 303 F. Supp. 3d at 1010 ("Many courts

violation of foreign law, especially when the Hague Evidence Convention may be conducive to the overall discovery process and should eliminate the possibility of French prosecution.[118] The Supreme Court of the United States has previously held that "fear of criminal prosecution constitutes a weighty excuse for nonproduction, and this excuse is not weakened because the laws preventing compliance are those of a foreign sovereign." *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 211 (1958). While the United States has a clear interest in the integrity of its judicial processes, CSG also has a clear interest in not violating its domestic laws. This Court concludes that any risk of French prosecution of CSG is not worth the indeterminate, and likely minimal, increase in time to produce, especially when the Claimants have been slow in requesting the documents and information from CSG. The Court refuses to force CSG, a nonparty French company, to run afoul of the French Blocking Statute.[119]

have expressed doubt as to whether the French Blocking Statute subjects parties to a 'realistic risk of prosecution.'" (quoting *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944, 2014 WL 5462496, at *6 (N.D. Cal. Oct. 23, 2014))); *Motorola Credit Corp. v. Uzan*, 73 F. Supp. 3d 397, 403 (S.D.N.Y. 2014), *on reconsideration*, 132 F. Supp. 3d 518 (S.D.N.Y. 2015) ("[W]hen a foreign court orders production of French documents even though the producing party has raised the 'excuse' of the French blocking statute, the French authorities do not, in fact, prosecute or otherwise punish the producing party."); *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. at 849 ("[T]he chance of prosecution under the French Blocking Statute is minimal."); *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02CIV5571, 2006 WL 3378115, at *3 (S.D.N.Y. Nov. 16, 2006) ("The majority of courts that have examined the issue have held that France has little interest in the enforcement of its Blocking statute."); *Bodner v. Paribas*, 202 F.R.D. 370, 375 (E.D.N.Y. 2000) ("[T]he French Blocking Statute does not subject defendants to a realistic risk of prosecution.").

[118] CSG's Reply ¶ 47 ("[T]he creation of the National Financial Prosecutor Office 'ha[s] led to a clear shift in France's enforcement posture to prosecuting breaches of the French Blocking Statute.'" (quoting Navacelle Decl. ¶ 13)).

[119] The Court attempted to alleviate the Claimants' concerns with the Hague Evidence Convention procedures by implementing procedural guardrails in this Order and subsequent orders as necessary. *See infra* subsection F (describing various procedural considerations that this Court will implement to ensure the Hague Evidence Convention is effective and efficient).

**6. Additional Comity Factors.**

39. In addition to the five comity factors assessed by the Supreme Court of the United States in *Aérospatiale*, the United States Court of Appeals for the Second Circuit also considers two additional factors. While the Fourth Circuit has not expressly adopted the Second Circuit's two additional factors,[120] the Court feels it is prudent to examine both factors: "(6) good faith of the party resisting discovery; and (7) the hardship of compliance on the party or witness from whom discovery is sought." *Glob. Power*, 418 B.R. at 847 (citing *Strauss*, 249 F.R.D. at 224–26). Although the Fourth Circuit has yet to expressly adopt these additional factors, it has emphasized the importance of not "undermin[ing] the 'predictability, fairness, ease of commercial interactions, and "stability through satisfaction of mutual expectations"' that comity serves." *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 947 F.3d 234, 239 (4th Cir. 2020) (quoting *Aérospatiale*, 482 U.S. at 567 (Blackmun, J., concurring in part and dissenting in part) (quoting *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984))).[121] In abundance of caution, the Court will address these additional comity factors.

40. Starting with the "good faith" factor, this factor weighs in favor of the Hague Evidence Convention if an entity "has consistently maintained that [it] should pursue depositions through the Hague Convention." *Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384, 2020 WL 12968653, at *10 (N.D. Tex. Feb. 19, 2020). Here, the timing of CSG's Motion for a Protective Order was not improper because CSG has been consistent about its demand to utilize the Hague Evidence Convention procedures since CSG's Response to the CSG Subpoenas was submitted to

[120] *See Est. of Ke v. Yu*, 105 F.4th 648, 659 (4th Cir. 2024); *dmarcian, Inc. v. dmarcian Eur. BV*, 60 F.4th 119, 147 (4th Cir. 2023); *Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 947 F.3d 234, 239 (4th Cir. 2020).

[121] The Ninth Circuit has also found that the *Aérospatiale* list of factors "is not exhaustive." *Richmark*, 959 F.2d at 1475.

the Claimants in July 2024.[122] Furthermore, CSG told the Claimants about the constraints raised by the French Blocking Statute as early as May 19, 2024, and forwarded the SISSE letter, alongside CSG's Response to the CSG Subpoenas, to Claimants on July 5, 2024.[123] The Claimants could not have been surprised by CSG's June 2026 request to proceed under the Hague Evidence Convention in the Motion for a Protective Order. Furthermore, there are no indications that the Motion for a Protective Order serves exclusively as a "bad faith" tactic to delay the discovery process. *Rotstain*, 2020 WL 12968653, at *11. The lengthy time gaps between the Case Management Order, the issuance of the CSG Subpoenas, and the Claimants and CSG's subsequent meet-and-confers lends credence to the idea that utilizing a commissioner under the Hague Evidence Convention may help generate and sustain forward momentum on this matter. CSG's "good faith" provision of reasonable notice and situational awareness to counsel for the Claimants weighs in favor of granting the Motion for a Protective Order and adhering to the Hague Evidence Convention procedures. *Glob. Power*, 418 B.R. at 847.

41. Moving on to the final factor, the Hague Evidence Convention procedures are favored if the entity subject to the subpoena faces a "hardship of compliance." *Glob. Power*, 418 B.R. at 847. "In determining whether a litigant will endure hardship in complying with a discovery request, courts generally have looked to three elements: whether foreign law creates penalties for complying with discovery requests of U.S. origin, the likelihood that foreign authorities will enforce those laws, and the party/nonparty status of the litigant resisting discovery." *S.E.C. v. Stanford Int'l Bank, Ltd.*, 776 F. Supp. 2d 323, 337 (N.D. Tex. 2011). If maximally enforced, the French Blocking Statute could impose criminal and civil penalties on CSG and its employees for

---

[122] The first objection in CSG's Response to the CSG Subpoenas, which was sent the Claimants on July 5, 2024, described the French Blocking Statute and the necessity of proceeding under the Hague Evidence Convention. *See* Beausoleil Decl. Exs. E & F at 2; Mot. to Compel ¶ 18; CSG's Objection ¶ 28; Mot. for a Protective Order ¶ 31.
[123] *See* Beausoleil Decl. Ex. C; Mot. for a Protective Order ¶ 25, Ex. J at 1-6.

violations.[124] Therefore, the threat of civil and "criminal prosecution constitutes a weighty excuse for nonproduction." *Societe Internationale*, 357 U.S. at 211. The threat "is not weakened [merely] because the laws preventing compliance are those of a foreign sovereign." *Id.*

42. Without returning to the prior discussion on the likelihood of the French Ministry of Justice actually enforcing the French Blocking Statute,[125] the Court finds that a subpoena of a foreign nonparty, which creates any risk of criminal or civil prosecution for said nonparty, can reasonably be constituted as a "hardship of compliance" as it relates to this factor. *Glob. Power*, 418 B.R. at 847. While the Claimants aver that the risk of French prosecution is remote, the Court does not believe it is necessary, at this time and on this record, to order CSG to violate the French Blocking Statute.[126] Furthermore, CSG has plausibly alleged that French authorities have become more likely to prosecute violations of the French Block Statute since the creation of the National Financial Prosecutor Office and the 2022 Decree.[127] The Court adheres to the belief that "[t]he existence of foreign laws regulating a litigant's ability to comply with discovery requests generally militates in favor of finding hardship." *Stanford*, 776 F. Supp. 2d at 338. CSG should not have to bear the heavy burden of facing risk of prosecution for violating of the French Blocking Statutes "merely" because CSG is a nonparty, a "neutral source of information, and not itself a target of a criminal investigation or an adverse party in litigation." *Minpeco*, 116 F.R.D. at 526–27.

---

[124] *See Salt River*, 303 F. Supp. 3d at 1010 ("[T]he statute at least creates a possibility of criminal prosecution."); *Strauss*, 242 F.R.D. at 225 ("The prospect that the foreign litigant would face criminal penalties rather than civil liabilities weighs in favor of the objecting party.").

[125] *See supra* note 117.

[126] The situation may change if progress slows or the Hague Evidence Convention procedures prove unworkable or ill-suited to the matter at hand.

[127] *See* Navacelle Decl. ¶ 12–16; CSG's Reply ¶ 47.

**7. Comity Factors Conclusion.**

43. In conclusion, the totality of the comity factors weighs in favor of proceeding in accordance with the Hague Evidence Convention. The factors favoring the Hague Evidence Convention procedures include: (1) the contested criticality of the requested evidence, (2) the broad and generalized subpoenas, (3) the origination of the information in France, (4) CSG's good faith, and (5) CSG's potential hardship in compliance due to the French Blocking Statute. Only two comity factors were inconclusive: the alternative means to acquire the information and balancing of the U.S. and French interests. Out of an abundance of caution, the Court favors the Hague Evidence Convention after assessing the *Aérospatiale* factors and the two additional comity factors articulated by the Second Circuit and accedes to the appointment of a commissioner under Chapter II of the Hague Evidence Convention.[128]

44. Therefore, the Court partially grants CSG's Motion for a Protective Order to proceed in accordance with the Hague Evidence Convention procedures because this path is most likely to "prove to be conducive to discovery." *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d at 300 (quoting *Aérospatiale*, 482 U.S. at 536). By partially granting CSG's Motion for a Protective Order, the Court seeks to accelerate the production of the CSG Exclusive Evidence while, at the same time, "exercis[ing] special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position." *Aérospatiale*, 482 U.S. at 546. While the Claimants may have some basis to fear CSG

---

[128] *See Finjan, Inc. v. Zscaler, Inc.*, No. 17CV06946, 2019 WL 618554, at *2 (N.D. Cal. Feb. 14, 2019) ("Defendant contends that the information could be produced by domestic custodians. . . . [H]owever, . . . it is not clear the domestic custodians would have the same information."); *Salt River*, 303 F. Supp. 3d at 1010 (D. Ariz. 2018) (deciding to apply the Hague Evidence Convention's procedures in part based on the foreign party's assertion "without equivocation" that it would comply with an order that directed the use of the Hague Evidence Convention).

raising French or European Law challenges following the implementation of the Hague Evidence Convention,[129] this Court remains the ultimate adjudicator for all disputes.[130]

**E. Scope of the CSG Subpoenas.**

45. In CSG's Response to the CSG Subpoenas, and subsequently in CSG's Objection to the Claimants' Motion to Compel, CSG objected to twenty-four of the twenty-six requests made by the Claimants in the CSG Subpoenas on the generic grounds of "relevance, overbreadth, and privilege." CSG's Objection ¶¶ 28–30 (citing Beausoleil Decl. Exs. E & F). CSG then specifically objected to the requests numbered six and thirteen on distinct grounds. *Id.* ¶ 30. In the interests of

[129] In CSG's Response to the CSG Subpoenas, CSG objected to any disclosures that would violate "the European Union General Data Protection Regulation (the 'GDPR'), Republic of France Law No. 78-17 of Jan. 6, 1978, the French Blocking Statute, or any other privacy laws, data protection, and/or export control laws." CSG's Response to CSG Subpoenas ¶ 9. It follows that CSG may be contemplating future objections based on French or European law given the different evidentiary and privacy standards. The Court cautions that while the parties must comply with the Hague Evidence Convention and requisite foreign laws, this process is not intended to provide CSG with roadblocks to discovery.

[130] *See, e.g.*, *Aérospatiale*, 482 U.S. at 542("It is well known that the scope of American discovery is often significantly broader than is permitted in other jurisdictions, and we are satisfied that foreign tribunals will recognize that the final decision on the evidence to be used in litigation conducted in American courts must be made by those courts. We therefore do not believe that an American court should refuse to make use of Convention procedures because of a concern that it may ultimately find it necessary to order the production of evidence that a foreign tribunal permitted a party to withhold."); *Stanford*, 776 F. Supp. 2d at 342 ("Alternatively, if the Receiver fails to obtain the needed discovery through the Convention, the Court is prepared to revisit the balancing of factors it has reached today."); *In re Perrier*, 138 F.R.D. at 356 (granting production under the Hague Evidence Convention procedures with the caveat that "[s]hould these procedures prove unavailing, and upon request, the Court shall consider modification of this Order."); Order Issuing Letter of Request, Appointing Commissioner, and Directing Submission of Hague Convention Application ¶ 6 [Doc. No. 105], *SEC v. Martin-Artajo*, No. 13-cv-05677 (S.D.N.Y. Jan. 19, 2016) ("The Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this order."); Order Issuing Request for International Judicial Assistance, Appointing Commissioner, Directing Submission of Hague Convention Application ¶ 6 [Doc. No. 83-2], *Lataillade v. LVMH Moet Hennessy-Louis Vuitton SE*, No. 1:16-cv-06637 (S.D.N.Y. Oct. 13, 2017) ("Any unresolved disputes . . . shall be determined exclusively by this Court."); Order Amending Letter of Request, Appointing Commissioner, and Directing Submission of Hague Convention Application ¶ 6 [ Doc. No. 12421], *In re Nortel Networks Inc.*, No. 09-10138 (Bankr. D. Del. Nov 19, 2013) ("The Court Shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this order."); Order Issuing Letter of Request, Appointing Commissioner, and Directing Submission of Hague Convention Application, *id.* ¶ 7 [Doc. No. 12313]; Order Issuing Letter of Request, Appointing Commissioner, and Directing Submission of Hague Convention Application to Permit Philippe Albert-Lebrun to Give Written Evidence for Trial, *id.* ¶ 7 [Doc. No. 13343].

fueling the positive momentum,[131] the Court will first address CSG's objections to the twenty-four requests on the grounds of being overbroad, duplicative, unduly burdensome, and irrelevant. The Court will then address CSG's specific objections to the sixth and thirteenth requests in the CSG Subpoenas.

**1. The CSG Subpoenas Are Not Overbroad, Duplicative, Unduly Burdensome, or Irrelevant.**

46. The Court does not sustain CSG's objections to twenty-four of the twenty-six requests in the CSG Subpoenas on the grounds that the requests are overbroad, duplicative, unduly burdensome, and irrelevant. *See* CSG's Objection ¶ 29, 56–75. Still, the Court addresses these objections in this Order, prior to initiating the Hague Evidence Convention procedures, because the Court has a duty to "secur[e] the prompt, economical and orderly administration of its bankruptcy cases." *In re Glob. Power Equip. Grp. Inc.*, 418 B.R. at 848; *see also* FED. R. CIV. P. 1 (imploring "the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding"); *Herbert v. Lando*, 441 U.S. 153, 177, (1979) ("[J]udges should not hesitate to exercise appropriate control over the discovery process."). When faced with a request to proceed with discovery in accordance with the Hague Evidence Convention procedures, numerous courts have decided to grant the request and apply fundamental discovery standards to narrow or otherwise address the scope of discovery requests submitted to foreign entities.[132] Thus,

[131] Any progress made towards production in response to the CSG Subpoenas stalled in 2026 after multiple email exchanges and meet-and-confers in 2025 seemed to indicate substantial headway made in narrowing down the timeline, custodians, and search terms. *See* Mot. for a Protective Order ¶ 38; Beausoleil Decl. Ex. Q.

[132] *See, e.g.*, Order Granting Application for a Letter of Request Under the Hague Evidence Convention Ex. A, *In re Bestwall LLC* [Case No. 14-31795, Doc. No. 2402] (Bankr. W.D.N.C. Feb. 10, 2022) (granting the application for a letter of request, listing the specific evidence to be obtained, and addressing "specific concerns that were raised" at the hearing (quoting Hr'g Tr. 65:2–3, Feb. 2, 2022)); *McCarthy v. Johnson*, 640 F. Supp. 3d 69, 77 (D.D.C. 2022) ("As part of the comity analysis, the Court must also be satisfied that the proposed discovery 'is relevant, not overbroad, and proportional to the needs of the case.'" (quoting *Wight v. Bluman*, No. 20-cv-81688, 2021 WL 8999538, at *2 (S.D. Fla. May 6, 2021))). *But cf. In re Urethane Antitrust Litig.*, 267 F.R.D. 361, 365–66 (D. Kan. 2010) (rejecting an argument that all requests in a letter of request "must be admissible" at trial and instead applying

even in applying the Hague Evidence Convention procedures, it is appropriate for courts to define and limit the scope of the discovery requests prior to sending the discovery requests to a foreign commissioner.[133] While foreign courts may have some input over the scope of discovery request,[134] this Court is not precluded from preemptively narrowing or otherwise defining the scope. In this case, contrary to CSG's objections, the requests in the CSG subpoena are not overbroad, duplicative, or unduly burdensome, or irrelevant.

**a. Ripe for Adjudication.**

47. First, the Claimants assert in the Claimants' Reply and Response that "the issues CSG raises are not ripe for adjudication" and that "seeking relief via Objection is procedurally

---

"'liberal discovery permitted under the Federal Rules of Civil Procedure,' making no distinction between discovery sought in the United States and discovery sought abroad under the Hague Convention." (citations omitted)).

[133] In *Behrens v. Arconic, Inc.*, the court sought to define and limit the scope of the evidence to be obtained before submitting a finalized request to the French authorities asking to appoint a commissioner under the Hague Evidence Convention. *See* Request for International Judicial Assistance in the Authorization of a Commissioner Pursuant to Chapter II of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters [Doc. No. 199], *Behrens*, No. CV 19-2664, (June 15, 2020) (establishing the scope of the request in the "evidence to be obtained" section, but does not detail the legal standard used to set those boundaries).

[134] *See Aérospatiale*, 482 U.S. at 542 ("It is well known that the scope of American discovery is often significantly broader than is permitted in other jurisdictions, and we are satisfied that foreign tribunals will recognize that the final decision on the evidence to be used in litigation conducted in American courts must be made by those courts."); *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 254 F. Supp. 2d 469, 475 (D. Del. 2003) ("If Dell's document requests are overly broad under the law of the Netherlands, as Tulip maintains, then the requests will presumably be narrowed by the appropriate judicial authorities in the Netherlands before any documents are produced. . . . The Court is content that such officials will make the appropriate determination under their own law."); *Pronova BioPharma Norge AS v. Teva Pharms. USA, Inc.*, 708 F. Supp. 2d 450, 454 (D. Del. 2010) ("The court is also not convinced that the defendants must revise their Letters of Request to clarify that they will not inquire into matters which are subject to the attorney-client or any other applicable privilege, or that they will take the most restrictive view of privilege applicable, whether it be under United States, Norwegian, or Swedish law."); *McCarthy v. Johnson*, 640 F. Supp. 3d 69, 81 (D.D.C. 2022) ("[I]f the appropriate judicial authorities in Hong Kong find the requests overbroad, they may narrow them." (citing *Lantheus Med. Imaging, Inc. v. Zurich Am. Ins. Co.*, 841 F. Supp. 2d 769, 794 (S.D.N.Y. 2012) ("[F]oreign courts charged with enforcing letters rogatory may limit enforcement of the discovery device where appropriate."); *S.E.C. v. Tourre*, No. 10 CIV. 3229 BSJ MHD, 2011 WL 350286, at *1 (S.D.N.Y. Jan. 31, 2011) ("[W]e leave to the German authorities the decision whether to honor all, some or none of these requests.") *Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 254 F. Supp. 2d 469, 475 (D. Del. 2003) ("If Dell's document requests are overly broad under the law of the Netherlands, as Tulip maintains, then the requests will presumably be narrowed by the appropriate judicial authorities in the Netherlands before any documents are produced."))).

inappropriate." Claimants' Reply and Response ¶¶ 77, 79. The Court agrees with the Claimants that the Federal Rules of Bankruptcy Procedure require a party to seek relief from the Court through a written motion rather than on objection,[135] but the Court here will address the objections raised by CSG concerning the appropriate scope of the CSG Subpoenas in the context of the nomination of a commissioner under Chapter II of the Hague Evidence Convention. Fundamental questions such as the relevancy, breadth, and burden of the Request[136] must be addressed at the outset to adequately contour the scope of the submission sent to the French Ministry of Justice.

---

[135] An objection must respond to the relief sought in the motion to which it relates, not raise new relief requested. *See* FED. R. BANKR. P. 9013 ("A request for an order must be made by written motion.") & 9014(a) ("In a contested matter not otherwise governed by these rules, relief must be requested by motion."); *see also* FED. R. CIV. P. 7; *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." (citing *United States v. Williams,* 445 F.3d 724, 736 n. 6 (4th Cir. 2006); *Cooperman v. One Bancorp* (*In re One Bancorp Sec. Litig.*), 134 F.R.D. 4, 10 (D. Me. 1991) ("Plaintiffs advanced for the first time in their reply memorandum the argument that the Maine confidentiality statute does not apply to this question. The Court does not address that argument, as it should have been raised in Plaintiffs' first memorandum in support of the motion."))).

[136] The "Request" refers to the document nominating a Hague Evidence Convention commissioner that must be sent to the French Ministry of Justice. *See, e.g.,* Request for International Judicial Assistance in the Authorization of a Commissioner Pursuant to Chapter II of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters [Doc. No. 199], *Behrens*, No. CV 19-2664 (June 15, 2020); Request for International Judicial Assistance Pursuant to Chapter II of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters: Written Evidence of Philippe Albert-Lebrun [Doc. No. 13343-1], *In re Nortel Networks Inc.*, No. 09-10138 (Bankr. D. Del. Apr. 16, 2024); Request for International Judicial Assistance Pursuant to Chapter II of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters [Doc. No. 104], *SEC v. Martin-Artajo*, No. 13-cv-05677 (S.D.N.Y. Jan. 19, 2016); Request for International Judicial Assistance in the Authorization of a Commissioner Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters [Doc. No. 84], *Lataillade v. LVMH Moet Hennessy-Louis Vuitton SE*, No. 1:16-cv-06637 (S.D.N.Y. Oct. 13, 2017); Application to Ministere de la Justice for Appointment of Commissioner and Privacy Monitor, and Direction of Submission of Hague Convention Application to Ministere de la Justice for Authorization of the Duly Appointed Commissioner and Privacy Monitor to Take Evidence Pursuant to Chapter II, Article 17 of the Hague Convention of 18 March 1970, *Dunham v. Covidien, LP*, No. 1:19-cv-02851 [Doc. No. 39] (S.D.N.Y. Dec. 10, 2020); Request for International Judicial Assistance in the Authorization of a Commissioner Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters [Doc. No. 199], *In re Commodity Exch., Inc., Gold Futures & Options Trading Litig.*, No. 14-MC-2548 (S.D.N.Y. Dec. 27, 2016); Request for International Judicial Assistance in the Authorization of a Commissioner Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters [Doc. No. 352], *id.* (Jan. 3, 2019).

48. At this time, it does not offend the Court's sense of fairness to address generic questions regarding the appropriate scope of discovery because the CSG Subpoenas are substantially similar to the requests sent to Non-Debtor U.S. Defendants,[137] subject to the Claimants and CSG continuing to make progress in narrowing key issues like search terms.[138] The CSG Subpoenas "cover the same substantive categories as the requests for production that [the Claimants] served on [the Non-Debtor U.S.] Defendants in June 2023, often using identical language." CSG's Objection ¶ 66, Ex. A; Mot. to Compel Ex. F. Any objection by CSG claiming that a request is overbroad, duplicative, unduly burdensome, or irrelevant is likely to also have been raised by the Non-Debtor U.S. Defendants, and yet the Claimants and Non-Debtor U.S. Defendants have made substantial progress in narrowing the issues.[139]

49. The United States Court of Appeals for the Fourth Circuit "affords a district court substantial discretion in managing discovery." *Lone Star Steakhouse & Saloon, Inc.*, 43 F.3d at 929. That is because "[d]iscoverable evidence is broader than admissible evidence." *Est. of Bryant v. Baltimore Police Dep't*, No. ELH-19-384, 2020 WL 6161708, at *3 (D. Md. Oct. 21, 2020). It is important to note that "[c]ourts look with 'disfavor on conclusory or boilerplate objections that discovery requests are irrelevant, immaterial, unduly burdensome, or overly broad.'" *In re Terrell*, 569 B.R. 881, 887 (Bankr. W.D. Okla. 2017) (quoting *In re Waldrop*, 560 B.R. 806, 810 (Bankr. W.D. Okla. 2016)). While courts "give the recipient's nonparty status 'special weight,' leading to

[137] CSG's Objection ¶ 66, Ex. A; Mot. to Compel Ex. F.
[138] CSG was carbon copied on at least some of the emails that scheduled discovery negotiations between the Claimants, the Debtor, and the Non-Debtor U.S. Defendants. In fact, Exhibits K, N, O, P, and Q of the Beausoleil Declaration contain several long email chains between the Claimants, CSG, the Debtor, and the Non-Debtor U.S. Defendants discussing the scope of discovery. The fact that counsel for all of those entities were either the direct recipient of, or carbon copied on, most of those emails indicates that all the entities on the email chains had adequate notice about ongoing discovery negotiations in response to both the 2023 Discovery Requests and the CSG Subpoenas. *See* Mot. for a Protective Order ¶ 38; Beausoleil Decl. K, N, O, P & Q.
[139] *See supra* note 63 (detailing the September 2026 consent order between the Claimants and the Debtor regarding discovery issues).

an even more 'demanding and sensitive' inquiry" as to the appropriateness of a subpoena,[140] that does not mean that "boilerplate objections to discovery requests" will be sustained.[141]

**b. Not Overly Broad.**

50. Second, CSG asserts in CSG's Response to the CSG Subpoenas that the requests in the CSG Subpoenas are too broad, a request is overbroad if it "seeks information beyond what the requesting party reasonably requires." *Jordan*, 921 F.3d at 190. Some district courts within the Fourth Circuit have held that "documents requests seeking 'any and all' documents 'relating to' are overly broad." *Donnelly v. Arringdon Dev., Inc*, No. 1:04CV889, 2005 WL 8167556, at *1 (M.D.N.C. Nov. 8, 2005). While a request for "any and all" email may be "overly broad and burdensome,"[142] that is not always the case.[143] In *Alexander v. F.B.I.*, a district court only found that a request for "any and all" to be "clearly over broad" only because the "request [was] not limited to materials that may be relevant or lead to the production of admissible evidence nor is it restricted to the relevant time period." 186 F.R.D. 21, 34–35 (D.D.C. 1998).

51. Here, the CSG Subpoenas are not overbroad because the requests are appropriately scoped in terms of timeframe,[144] custodians,[145] and the specific documents and communications requested.[146] The information provided to the Court in the pleadings and at the Hearing indicates that the Claimants and CSG should strive to regain the momentum towards refining the search

[140] *Jordan*, 921 F.3d at 189 (quoting *Weinman v. Cable* (*In re Pub. Offering PLE Antitrust Litig.*), 427 F.3d 49, 53 (1st Cir. 2005)).
[141] *Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 241 (M.D.N.C. 2010) ("[M]agistrate judges in at least five district courts in the Fourth Circuit have declared boilerplate objections to discovery requests, including for documents, invalid.").
[142] *Williams v. Hernandez*, 221 F.R.D. 414, 416 (S.D.N.Y. 2004).
[143] *See HDSherer LLC v. Nat. Molecular Testing Corp.*, 292 F.R.D. 305, 309 (D.S.C. 2013) ("[T]he subpoenas are not overly broad on their face as the requests are limited in time and scope.").
[144] *See supra* note 27.
[145] *See supra* note 28.
[146] *See supra* note 29.

terms that was building in the latter half of 2025. While twenty-five of the twenty-six requests in the CSG Subpoenas seek "all" documents or communications,[147] and the vast majority of requests seek documents "relating to" a particular topic, all of the requests include sufficient detail about the particular information sought by specifying the relevant topics, events, and actions of CSG and its subsidiaries. Furthermore, the CSG Subpoenas include thirty defined terms that help to provide additional clarity. *See* Mot. to Compel Ex. F. As an example, the first request in the CSG Subpoenas seeks "[a]ll Documents relating to the Corporate Restructuring, including Documents relating to the purpose of, rationale for, motivation for, or reason behind any transfer, distribution, disposition, allocation, or change of control of any rights, obligations, liabilities, claims, funds, assets, or consideration of any kind made in connection with the Corporate Restructuring." Mot. to Compel Exs. E & F. Although this request includes the broad terms "all" and "relating to," it is sufficiently narrowed in scope by the defined terms[148] and particularized transaction descriptors, which serve to constrain the range of responsive documents and communications that CSG would have to produce.

52. The requests in the CSG Subpoenas are not "broad-brush request[s]" that amount "to seeking all documents relating to the allegations in a complaint." *Donnelly*, 2005 WL 8167556, at *2. While preliminary discussions between CSG and the Claimants indicated that a significant number of documents and communications may be encompassed by CSG Subpoenas,[149] the Claimants' request appears rational when factoring in the multi-year timeframe, the number of

[147] Only request number thirteen does not seek "all" documents or communications. Mot. to Compel Exs. E & F.

[148] The CSG Subpoenas define "Corporate Restructuring" as "the restructuring that occurred on or about October 23, 2019, through which Old CertainTeed converted to CertainTeed LLC and the Debtor was created." Mot. to Compel Ex. F.

[149] A preliminary search term hit list generated by CSG returned upwards of four-hundred and twenty-nine thousand (429,000) results. *See* Beausoleil Decl. Ex. N, at 1. The Court recognizes that this number is subject to continuing negotiations on search terms and will assist by adjudicating any further disputes regarding the refinement of the search terms should the Claimants and CSG be unable to come to an agreement.

custodians, the financial magnitude of the alleged transgression, and the fact that CSG is a large multinational company with subsidiaries across the globe. The Court finds that the requests in the CSG subpoenas are not overbroad, subject to continuing negotiations on, and refinement of, the search terms by the Claimants and CSG.

**c. Duplicativeness.**

53. Likewise, the CSG Subpoenas are not necessarily duplicative or unduly burdensome as argued by CSG.[150] A request made to a nonparty may be duplicative or unduly burdensome if the requesting party could "obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation." *Jordan*, 921 F.3d at 189. CSG believes the CSG Subpoenas are duplicative of the discovery requests that Claimants sent to the Debtor and Non-Debtor U.S. Defendants in the Fraudulent Transfer Proceeding, the Substantive Consolidation Proceeding, and the Preliminary Injunction Proceeding.[151] *See* CSG's Objection ¶¶ 23, 64 (describing many of the requests as "substantive[ly] . . . identical" to the requests that the Claimants sent to the Debtor and Non-Debtor U.S. Defendants); Mot. for a Protective Order ¶ 73 ("Of the 26 requests for production in the Subpoenas, 22 are identical, or substantially similar, to the requests that Plaintiffs have already served on the direct Defendants in the Fraudulent Conveyance Proceeding. . . . The other four requests are identical, or substantially similar, to the requests that Plaintiffs have already served on the direct Defendants in the Substantive Consolidation Proceeding.").

54. While the Claimants may have made the same or similar requests to the Debtor, the Non-Debtor U.S. Defendants, and CSG, that does not mean that all three entities have the ability

[150] CSG's Objection ¶¶ 64–75.

[151] "Preliminary Injunction Proceeding" refers to DBMP LLC v. Those Parties Listed on Appendix A to Complaint and John and Jane Does 1-1000, Adv. Proc. No. 20-03004 (Bankr. W.D.N.C.).

to or ultimately will produce the exact same documents or communication. The Debtor and Non-Debtor U.S. Defendants made clear in their objections to the Motion to Compel that they do not believe that they have possession, custody, or control over the CSG Exclusive Evidence.[152] Therefore, while some of the Claimants' requests may overlap, CSG's production will contain some documents or communications that the Debtor and Non-Debtor are not able to produce. It is important to note that as of the date of this Order, the Debtor and Non-Debtor U.S. Defendants have not completed production of discovery.[153] Therefore, the Court is left to speculate what may or may not be redundant, and so airs on the side of caution by allowing Claimants' discovery efforts against both CSG and the Debtor / Non-Debtor U.S. Defendants to proceed until the Court is made aware of the specific redundancies of those production efforts.

**d. Not Unduly Burdensome.**

55. Third, the CSG Subpoenas are not unduly burdensome for CSG because CSG and its counsel are already heavily involved in discovery negotiations with the Claimants and have made significant progress establishing a timeframe,[154] custodians,[155] and search term list.[156] Compelling CSG to continue the process of responding to the CSG Subpoenas will not "require [CSG] to incur excessive expenditure of time or money." *Cook v. Howard*, 484 F. App'x 805, 812 (4th Cir. 2012). Furthermore, proceeding in accordance with CSG's preferred procedural process, a commissioner under Hague Evidence Convention, should minimize any friction in production.

---

[152] *See* Debtor's Objection ¶¶ 4–8; Non-Debtor U.S. Defendant's Objection ¶ 1.
[153] *See The Official Committee of Asbestos Personal Injury Claimants' and the Future Claimants' Representative's Motion for a Finding of Waiver of Privilege or Immunity and for an Order Compelling the Debtor to Produce Withheld Documents* [Case No. 20-30080, Doc. No. 3584] (Aug. 13, 2026).
[154] *See supra* note 27.
[155] *See supra* note 28.
[156] *See supra* note 30.

**e. Relevance**

56. Lastly, the CSG Subpoenas request documents and information that may be relevant to the claims made by the Claimants in the Fraudulent Transfer Proceeding and the Substantive Consolidation Proceeding. "A nonparty should not have to do the work of tailoring a subpoena to what the requesting party needs; the requesting party should have done that before serving it." *Jordan*, 921 F.3d at 190. The Claimants seek to investigate the degree of CSG's involvement in the Restructuring and the Debtor's decision to file a bankruptcy petition. Even though CSG is not a party in either the Fraudulent Transfer Proceeding or the Substantive Consolidation Proceeding, CSG's state of mind is relevant to the intent element of the fraudulent transfer claims and the substantive consolidation claim. Therefore, the Claimants' requests in the CSG Subpoenas have not devolved into a "fishing expedition." *Howard*, 2016 WL 4384658, at *3 (quoting *Sandcrest Outpatient Servs., P.A.*, 853 F.2d at 1147).[157]

57. Ultimately, for the purposes of the Hague Evidence Convention, the Court does not sustain CSG's objections to twenty-four of the twenty-six requests in the CSG Subpoenas on the bases of being overbroad, duplicative, unduly burdensome, or irrelevant. For those twenty-four requests, the Court is encouraged by the level of refinement that the Claimants and CSG have achieved as to the scope of the requests given the settled timeframe, established custodians, and detailed discussions on search terms. Additional time and another meet-and-confer between the Claimants and CSG may help finalize the confines of the request and enable production to begin.

[157] *See also Jiangmen Kinwai Furniture Decoration Co. v. IHFC Props., LLC*, No. 1:14-CV-689, 2015 WL 5098791, at *6 (M.D.N.C. Aug. 31, 2015) ("It may well be that, within the broad categories of documents and deposition topics, there could be something potentially relevant. That, however, does not justify a fishing expedition.")

### 2. CSG's Request to Quash the Sixth and Thirteenth Requests in the CSG Subpoenas.

58. In CSG's Objection to the Claimants' Motion to Compel, CSG seeks to "quash requests 6 and 13" in the CSG Subpoenas. CSG's Objection ¶ 81. CSG specifically objected to those two requests on the bases of attorney-client privilege[158] and attorney work-product doctrine.[159] *See* Beausoleil Decl. Exs. E, at 26-27 & F, at 26-27; *see also* Beausoleil Decl. Exs. A, at 10 & B, at 10. "[T]he burden of proof is with the party objecting to the discovery to establish that the challenged production should not be permitted." *Gilmore*, 339 F.R.D. at 121 (quoting *Jimmy A. Dunn Excavating Co. v. Eagle Pipeline, LLC*, No. 2:16cv4409, 2020 WL 1876338, at *2 (S.D. W. Va. Apr. 15, 2020)); *see also Jordan*, 921 F.3d at 189 n.2 (holding that "[t]he moving party bears those burdens" of proof and of persuasion, "[b]ut they are not terribly difficult burdens to meet if the requesting party cannot articulate its need for the information and address obvious alternative sources"). Subsection A of Federal Rule of Civil Procedure 45(d)(3) states that a court "must" quash or modify a subpoena "[o]n timely motion" whereas subsection B merely states that a court "may, on motion, quash or modify the subpoena." FED. R. CIV. P. 45(d)(3).[160] Unfortunately

---

[158] *See Neuberger Berman Real Est. Income Fund, Inc. v. Lola Brown Tr. No. 1B*, 230 F.R.D. 398, 409 (D. Md. 2005) ("The burden is on the proponent of the privilege to demonstrate 'not only that an attorney-client relationship existed, but also that the particular communications at issue are privileged and that the privilege was not waived.'" (quoting *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982)). Conversely, "an internal memorandum between two non-lawyers that mentions no communications that might fall within the attorney-client privilege" is not protected by attorney-client privilege. *Fed. Election Comm'n v. Christian Coal.*, 178 F.R.D. 61, 71 (E.D. Va.), *order aff'd in part, modified in part*, 178 F.R.D. 456 (E.D. Va. 1998).

[159] The attorney work-product doctrine prevents a party from "discover[ing] documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). "The work-product rule shields from disclosure materials prepared 'in anticipation of litigation' by a party, or the party's representative, absent a showing of substantial need." *United States v. Adlman*, 68 F.3d 1495, 1501 (2d Cir. 1995).

[160] Some courts modified subpoenas following motions to compel without the need for an explicit motion to quash because the parties made timely and appropriate objections. *See Am. Fed'n of Musicians of the United States & Canada v. Skodam Films, LLC*, 313 F.R.D. 39, 54–55 (N.D. Tex. 2015) ("Balancing all of these considerations and requirements, the Court will order that the Subpoena is modified to require. . . . The Court otherwise quashes the Subpoena's requests for production except as modified here."); *Spivey v. BP Expl. & Prod. Inc.*, No. CV 18-12878,

for CSG, a request to quash a subpoena cannot be raised in a response like CSG's Objection to the Claimants' Motion to Compel.[161] As of the date of entry of this Order, CSG has not filed a motion to quash the sixth or thirteenth requests in the CSG Subpoenas. CSG did not mention the specific request to quash in its Motion for a Protective Order,[162] nor was a request made during the Hearing.

59. While the Court finds logic in CSG's assertion of attorney-client privilege, attorney work-product doctrine, and likely relevance, absent a motion to quash, the Court will not violate Federal Rule of Civil Procedure 45(d)(3) by quashing the sixth[163] and thirteenth[164] requests in the

---

2024 WL 5246598, at *5 (E.D. La. Dec. 30, 2024) ("In response to Plaintiff's subpoena duces tecum, API responded with written objections within the agreed extended deadline. Thus API was not also required to file a motion to quash or seek a protective order.").

[161] While some courts have acquiesced to a request to quash a subpoena raised in a movant's reply, it does not appear as though courts are willing to allow the same in a non-movant's response. *See Clawson*, 451 F. Supp. 2d at 734 ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered. . . . However, the power to decline consideration of such arguments is discretionary, and courts are not precluded from considering such issues in appropriate circumstances." (citing *Williams,* 445 F.3d at 736 n.6; *In re One Bancorp Sec. Litig.,* 134 F.R.D. at 10 n.5)); *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 531 (4th Cir. 2022) ("First, the untimely argument may be 'intimately related' to the original grounds for the motion, in which case a district court can overlook waiver. . . . Second, a non-movant's opportunity to contest an untimely argument in a sur-reply supports a district court's decision to consider the untimely argument." (quoting *Powell v. United States*, No. 16-cv-2960, 2017 WL 3172831, at *3 (D. Md. July 26, 2017))).

[162] At least one federal district court treated a motion for a protective order as a motion to quash, albeit with the consent of the opposing party. *See Pons v. Walter Kidde Portable Equip. Inc.*, No. 1:25-MC-91106, 2025 WL 1424519, at *2 (D. Mass. May 16, 2025) ("Nonetheless, though styled as a motion for a protective order, the plaintiffs cite Federal Rule of Civil Procedure 45(d)(3), not Federal Rule of Civil Procedure 26(c), and request relief that could be delivered by an order quashing the subpoena. . . . The plaintiffs also state that they 'have no objection to the Court treating the instant motion as a motion to quash the document-production component of the Kidde Subpoena.' . . . The Court will accordingly construe the motion as a Rule 45(d)(3) motion to quash and deem it properly filed." (internal citations omitted)).

[163] The sixth request asks for "[a]ll Documents relating to *In re Garlock Sealing Technologies LLC*, No. 10-31607 (Bankr. W.D.N.C.), *In re Bestwall LLC*, No. 17-31795 (Bankr. W.D.N.C.), *In re Paddock Enterprises LLC*, No. 20-10028 (Bankr. D. Del.), *In re Imerys Talc America, Inc.*, 19-10289 (Bankr. D. Del.), or any other actual or contemplated bankruptcy involving [a]sbestos liabilities or any other bankruptcy [y]ou evaluated in relation to [y]our [a]sbestos liabilities." Mot. to Compel Ex. F, at 17, 37. In essence, the Claimants seek information about certain bankruptcy matters that CSG may have "evaluated" before the Debtor filed its bankruptcy petition. *Id.* In preparation for the Restructuring and the filing of the Debtor's bankruptcy petition, counsel for CSG likely conducted legal research, produced work-product, and then informed CSG about those prior bankruptcies in order to clarify the legal landscape of asbestos bankruptcies. CSG believes the Claimants want to figure out "how DBMP or its affiliates prepared for DBMP's bankruptcy filing." CSG's Objection ¶ 79.

[164] The thirteenth request in the CSG Subpoenas sought "[e]ngagement letters from outside counsel, including Hughes Hubbard, Goodwin Proctor, and Jones Day, reflecting engagements by Saint Gobain Parent or any of its

CSG Subpoenas without a motion. Although the Court cannot quash the two requests under the Federal Rules of Civil Procedure, the Court would encourage the Parties to carefully consider the Court's concerns regarding attorney-client privilege and attorney work-product doctrine when crafting the evidence to be obtained section of the Request.

**F. The Hague Evidence Convention Process and the Duties of the Commissioner.**

60. The Court will proceed with the appointment of a commissioner in accordance with Chapter II of the Hague Evidence Convention.[165] Article 17 of the Hague Evidence Convention, which is contained within Chapter II, states that a commissioner may "take evidence in the territory of a Contracting State in aid of proceedings commenced in the courts of another Contracting State" so long as "a competent authority designated by the State where the evidence is to be taken has given its permission" and the commissioner "complies with the conditions" set by that State.[166]

---

Affiliates related to Project Horizon or the contemplated or actual Corporate Restructuring." Beausoleil Decl. Exs. A, at 11 & B, at 11. The Court questions the relevancy of this request following the Court's previous finding that "the decision for DBMP to file bankruptcy was made much prior to the January 22 Meeting and at least as of the Restructuring Date." *Order Partially Granting and Sustaining and Partially Denying Plaintiff's Privilege Motion and Defendants' Objection* ¶ 309 [Case No. 20-30080, Doc. No. 3390] (Mar. 16, 2026); *see also id.* at 43 n.223 ("[S]ome documents showed that the decision for DBMP to file bankruptcy was discussed internally as a planned strategy well before the bankruptcy happened, rather than being one option among many equal considerations. This could undercut DBMP's portrayal that the Chapter 11 filing was a last-resort or just one possible path, and how other documents indicated that officials from CSG were actively involved in planning the divisional merger and the handling of asbestos liabilities, which ran counter to suggestions that the parent company was hands-off or not part of the reorganization planning." (citing Final Referee Report at Apps. B–E)).

[165] *See* Timothy P. Harkness, Rahim Moloo, Patrick Oh & Charline Yim, Discovery in International Civil Litigation: A Guide for Judges 12-13 (2015) ("The Hague Convention creates two basic mechanisms by which a party to a proceeding in a contracting state may seek evidence abroad. First, it permits a judicial authority of a contracting state to submit a 'letter of request' to the competent authority of the requested state for the purpose of obtaining evidence. Second, the Hague Convention permits the taking of evidence by a diplomatic officer, consular agent, or commissioner of a contracting state in the territory of another contracting state under certain, limited circumstances." (citations omitted)).

[166] Hague Evidence Convention art. 17 ("In a civil or commercial matter, a person duly appointed as a commissioner for the purpose may, without compulsion, take evidence in the territory of a Contracting State in aid of proceedings commenced in the courts of another Contracting State if - a) a competent authority designated by the State where the evidence is to be taken has given its permission either generally or in the particular case; and b) he complies with the conditions which the competent authority has specified in the permission.").

The process begins with this Court nominating a commissioner in a formal written request that is sent to CSG and the French Ministry of Justice.[167] Once the French Ministry of Justice approves the Court's nominee for commissioner, the commissioner can begin receiving documents from CSG and transmitting them to the Claimants. If there is a dispute between CSG and the Claimants as to the relevant scope of production, the commissioner shall identify and categorize any documents or communications in dispute and submit a record of the dispute, along with a recommended ruling, to the Court in the commissioner's bi-monthly report for a final decision by this Court.[168] The Court finds the case of *Behrens v. Arconic* as an illustrative example of the process of appointing a commissioner under the Hague Evidence Convention with appropriate oversight by a U.S. Court.[169]

61. As CSG has recognized, the Court will not relinquish oversight of the CSG discovery as "this Court can always modify its order" if the "Hague Evidence Convention prove[s] to be cumbrous." Mot. for a Protective Order ¶ 98; *see also* Hr'g Tr. 85:6–7, July 28, 2026 ("[Y]ou will retain the authority to keep overseeing this.").[170] To further buttress the efficacy and timeliness

---

[167] The Request must specifically identify this Court, describe the litigation, identify evidence to be obtained or any testimony to be collected, affirm that the parties that consent to the taking of such evidence, describe the reasons for which Chapter II procedure is being chosen over the Chapter I procedure, and describe the selection process and criteria for the commissioner. *See supra* note 136. In the Motion for a Protective Order, CSG submitted a "proposed Order appointing Mr. de Navacelle as the commissioner." Mot. for a Protective Order ¶ 100. If the Claimants and CSG do not consensually nominate Mr. De Navacelle, the Court would have some reservations about selecting him for the role of commissioner due to his prior work on behalf of CSG.

[168] *See* Mot. for a Protective Order ¶ 97 ("[T]he commissioner is not a tribunal and does not determine the relevancy, admissibility, or discoverability of documents that CSG produces in response to the Subpoenas."); *id.* ("[T]he Commissioner's role is limited to supervising and formalizing the transmission process and making sure that the process complies with the Hague Convention and the corresponding French reservations to that Convention." (quoting Beausoleil Decl. ¶ 21)).

[169] The Court follows a case from the U.S. District Court for the Eastern District of Pennsylvania as a guiding light. *See* Request for International Judicial Assistance in the Authorization of a Commissioner Pursuant to Chapter II of the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters [Doc. No. 199], *Behrens v. Arconic, Inc.*, No. CV 19-2664, 2020 WL 1250956 (E.D. Pa. Mar. 13, 2020).

[170] *See supra* note 130.

of CSG's production under the Hague Evidence Convention, the Court adopts the following guardrails: bi-monthly status reports from the commissioner (with corresponding status hearings if necessary); clear limits to the scope of the discovery request in the initial Request sent to the French Ministry of Justice; and the potential for further guidance from the Court in the form of subsequent Court orders if the commissioner is unable to mediate any disputes that arise. The bi-monthly commissioner report shall contain a summary of the production progress, relevant statistics such as the number of documents and communications shared, a consolidated list of any disputes, and any further questions from the commissioner. The Court adopts these oversight measures in order to mitigate the Claimants' concerns about the burden of the Hague Evidence Convention Processes.[171]

62. The Supreme Court of the United States has emphasized that it does "not believe that an American court should refuse to make use of [the Hague Evidence] Convention procedures because of a concern that it may ultimately find it necessary to order the production of evidence that a foreign tribunal permitted a party to withhold." *Aérospatiale*, 482 U.S. at 542. The Court will work assiduously to ensure that the appointment of a commissioner serves as a catalyst to speed along the discovery process rather than serve as an additional roadblock,[172] and the Court will address any and all disputes raised by the commissioner in subsequent orders.[173]

---

[171] *See* Claimants' Reply and Response ¶ 58("Following SISSE's non-binding guidance as to the necessity of the Hague Convention procedures promises to be cumbersome, further delay these proceedings, and starve Plaintiffs of evidence otherwise efficiently accessible through the Federal Rules.").

[172] CSG believes that "[t]he [u]se of the Hague Evidence Convention [p]rocedures [w]ill [p]rove [e]ffective." Mot. for a Protective Order at 29; *see also* Hr'g Tr. 85:6–7, July 28, 2026 (counsel for CSG claiming that the Hague Evidence Convention will be "the fastest path"). *See also* supra note 130.

[173] *See Behrens* (Order [Doc. No. 183], Interim Supplement Order Re: Plaintiffs' Motion to Compel Discovery [Doc. No. 197], Memorandum Clarifying Dispute Concerning Hague Convention Proceedings [Doc. No. 206]); *see also Tiffany (NJ) LLC v. Andrew*, No. 10 CIV. 9471, 2012 WL 5451259, at *3 (S.D.N.Y. Nov. 7, 2012) ("[R]esort to the Hague Convention here has not proven futile. Although China, pursuant to its reservation of rights under the Convention, has not produced all the documents that would be required under the Federal Rules of Civil Procedure,

**WHEREFORE**

1. The Motion to Compel is **DENIED WITHOUT PREJUDICE**. The Debtor and Non-Debtor U.S. Defendants shall proceed with haste in the production of the U.S. Internal Evidence and U.S.-CSG Evidence.

    1.1. A status hearing will be held on February 4, 2027, at 9:30 a.m., at the Charles R. Jonas Federal Building, 401 West Trade Street, Courtroom 2B, Charlotte, North Carolina 28202, to discuss the progress in the discovery process with respect to the production of the U.S. Internal Evidence and U.S.-CSG Evidence.

2. The Motion for a Protective Order is **PARTIALLY GRANTED**. CSG shall conduct production in response to the CSG Subpoenas in accordance with the procedures of the Hague Evidence Convention but limited in scope by the determinations set forth in this Order and future supplemental orders of this Court, if necessary. A status hearing will be held on November 5, 2026, at 9:30 a.m., at the Charles R. Jonas Federal Building, 401 West Trade Street, Courtroom 2B, Charlotte, North Carolina 28202, to discuss the mechanisms for proceeding in compliance with the Hague Evidence Convention.

    2.1. The Claimants and CSG (the "Parties" collectively and each "Party" individually) shall meet-and-confer and draft a Request in accordance with the rulings contained in this Order. A French translation of the Request shall also be submitted. If the Parties are unable to agree on the appropriate language and scope of the Request, to include the identification of the relevant evidence to be obtained, then each Party shall file an appropriate pleading with a proposed draft of the Request by November 2, 2026, at 11:59 p.m. Eastern Standard Time. The section of the Request identifying the evidence to be obtained should be

---

its production is sufficient for plaintiffs to continue their investigation concerning the counterfeit goods at issue in their subpoenas against the Banks' New York branches is, therefore, denied.").

appropriately scoped by specifying, at a minimum, the timeframe, custodians, sources of electronically stored information, and search terms (in both French and English). Any further disputes regarding the scope of the evidence to be obtained in the Request will be addressed at the status hearing on November 5, 2026.

2.2. The Parties shall meet-and-confer and nominate a qualified and suitable commissioner that will expeditiously process the information and documents requested by the Claimants in accordance with the Hague Evidence Convention procedures. If the Parties are unable to agree on a nominee for commissioner before the status hearing on November 5, 2026, each Party may file an appropriate pleading to nominate an individual for the role of commissioner by 11:59 p.m. on November 2, 2026. The Court will evaluate and formally nominate the appropriate commissioner following the hearing on November 5, 2026. Furthermore, if the Parties are unable to agree on a nominee for commissioner, the nominee of each Party should be made available to testify, remotely if necessary, at the hearing on November 5, 2026. Once a commissioner is nominated by the Court and the Request is submitted to the French Ministry of Justice, the Parties shall alert the Court upon approval of the commissioner by the French Ministry of Justice. Thereafter, the commissioner shall send a concise bi-monthly status report to the Court on the progress of CSG's production. The Commissioner shall adhere to any further orders issued by the Court regarding this matter.

2.3. CSG will bear the costs of the Hague Evidence Convention proceedings, including, without limitation, the fees of the commissioner, translation fees or costs, and any transmittal costs associated with the production of documents or electronically-stored information.

3. The Court will not disrupt the inclusion of CSG as a Protected Party in the Preliminary Injunction.
4. This Court retains jurisdiction over any and all matters arising from or related to the implementation, enforcement, or interpretation of this Order.

**IT IS SO ORDERED.**

**This Order has been signed electronically.**
**The Judge's signature and Court's seal**
**appear at the top of this Order.**

**United States Bankruptcy Court**